FIRST IOWA HYDRO-ELECTRIC COOPERATIVE
*v.* FEDERAL POWER COMMISSION.
STATE OF IOWA, Intervenor.

No. 603.   Argued March 8, 1946.—Decided April 29, 1946.

*David W. Robinson, Jr.* argued the cause for petitioner. With him on the brief were *George B. Porter, Andrew G. Haley* and *John Connolly, Jr.*

*Howard E. Wahrenbrock* argued the cause for the Federal Power Commission, respondent. With him on the brief were *Solicitor General McGrath* and *Louis W. McKernan.*

*Neill Garrett* argued the cause for the State of Iowa, intervenor. With him on the brief were *John M. Rankin*, Attorney General of Iowa, *Horace L. Lohnes* and *C. Walter Harris*.

MR. JUSTICE BURTON delivered the opinion of the Court.

This case illustrates the integration of federal and state jurisdictions in licensing water power projects under the Federal Power Act.[1] The petitioner is the First Iowa Hydro-Electric Cooperative, a cooperative association organized under the laws of Iowa with power to generate, distribute and sell electric energy. On January 29, 1940, pursuant to § 23 (b) of the Federal Power Act,[2] it

---

[1] 41 Stat. 1063, as amended, 49 Stat. 838, 16 U. S. C. §§ 791a–825r.

[2] "SEC. 23. . . . (b) It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands . . . of the United States . . . except under and in accordance with the terms of . . . a license granted pursuant to this Act. Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this Act. If the Commission shall not so find, and if no public lands . . . are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws." 49 Stat. 846, 16 U. S. C. § 817.

filed with the Federal Power Commission a declaration of intention to construct and operate a dam, reservoir and hydro-electric power plant on the Cedar River, near Moscow, Iowa.[3]

On April 2, 1941, it also filed with the Commission an application for a license, under the Federal Power Act, to construct an enlarged project essentially like the one it now wishes to build. The cost of the enlarged project is estimated at $14,600,000. It calls for an 8,300 foot earthen dam on the Cedar River near Moscow, an 11,000 acre reservoir at that point and an eight-mile diversion canal to a power plant to be built near Muscatine on the Mississippi. The canal will create two other reservoirs totaling 2,000 acres. It is alleged that the three reservoirs incidentally will provide needed recreational facilities. The power plant will have four turbo-generating units with a total capacity of 50,000 kw., operating with an average head of 101 feet of water provided by the fall from the canal to the Mississippi. Water will be pumped from the Mississippi up to the head bays of the power intake dam at the plant to meet possible shortages in supply. The tailrace will extend for a mile along the shore of the Mississippi to a point below Dam 16 on that River. Transmission lines will connect the project with a source of steam standby electric current at Davenport, Iowa, 24 miles up the Mississippi. The plant is expected to produce 200,000,000 kwh. of marketable power per year, of which 151,000,000 kwh. will be firm energy in an average year. Interchange of energy is proposed with the Moline-Rock Island Manufacturing Company near Davenport and the project is suggested as an alternative to the addi-

---

[3] This described a project including an 8,500 foot earthen dam, and a power plant of three 5,000 kw. hydraulic turbine generators operating under a maximum head of 35 feet, with an estimated output of 47,000,000 kwh. per year. The water was to be returned to the Cedar River immediately below the dam.

tion of a 50,000 kw. unit to the plant of that company. The power will be available especially to non-profit rural electrification cooperative associations and to cities and towns in 35 or more nearby counties.

The Cedar River rises in Minnesota and flows 270 miles southeasterly through Iowa to Moscow, which is 10 miles west of the Mississippi. From there it flows southwesterly 29 miles to Columbus Junction where it joins the Iowa River and returns southeasterly 28 miles to the Mississippi. The proposed diversion will take all but about 25 c. f. s. of water from the Cedar River at Moscow. This will correspondingly reduce the flow in the Iowa River while the diverted water will enter the Mississippi at Muscatine, about 20 miles above its present point of entry at the mouth of the Iowa River. There are no cities or towns on the Cedar River between Moscow and Columbus Junction and the record indicates that the petitioner has options upon 98% of the riparian rights on the Cedar River in that area. At petitioner's request, this application was treated as a supplement to its then pending declaration of intention to construct the smaller project.

On June 3, 1941, the Commission made the following findings:

"(1) That the Cedar and Iowa Rivers are navigable waters of the United States;

(2) That the diversion of water from the Cedar River by means of the diversion canal as set forth above would have a direct and substantial effect upon the flow and stage of the Iowa River and hence would affect the navigable capacity of that river;

(3) That the alternate withholding of water in the reservoir and canal during periods of shut-down of the power plant and the release of water at substantial rates of flow during periods of operation of the power plant, as set forth above, would cause extreme fluctuations in the flow of the Mississippi River at

Muscatine, Iowa, and would substantially affect the navigable capacity of that river;

(4) That the interests of interstate commerce would be affected by construction of the project as described in the declaration of intention as supplemented;

(5) That the two small islands . . . [in the Cedar River] are public lands of the United States and will be partly or wholly flooded by the reservoir of the proposed project and will be occupied by the project;

(6) That a license for the construction proposed above is required under the provisions of the Federal Power Act." 2 Fed. Power Comm. Rep., 958.[4]

On August 11, 1941, the petitioner, pursuant to that finding, filed with the Commission an application for a license to construct the project above described. On November 4, 1941, the Commission granted the State of Iowa's petition to intervene and, since then, the State has opposed actively the granting of the federal license.

---

[4] On February 7, 1940, the Commission had sent notice to the Governor of Iowa of the filing of the original declaration of intention and invited him to present information and comments relative thereto. The State, however, took no part in the proceedings. The record also indicates that twice in the three years before the present proceeding, the Executive Council of the State of Iowa rejected applications of the petitioner requesting state permits to construct a dam near Moscow comparable to that proposed in all of these proceedings, but not including a diversion of water from the Cedar to the Mississippi River. The last application of the petitioner to the Council for such a permit was filed August 12, 1940, and rejected June 25, 1941. No application has been made by the petitioner to the Executive Council for a state permit for construction of the project including the canal diverting most of the flow of the Cedar River to the Mississippi and providing for a plant and tailrace on the bank of the Mississippi. In its petition to intervene in the present proceeding for a federal license, the State alleged that such a diversion would violate § 7771 (in Chapter 363) of the Code of Iowa, 1939. That allegation touches the principal question in this case.

On January 29, 1944, after extended hearings, the Commission rendered an opinion including the following statements:

"As first presented, the plans of the applicant for developing the water resources of the Cedar River were neither desirable nor adequate, but many important changes in design have been made. [The opinion here quoted in a footnote § 10 (a) of the Federal Power Act.][5] The applicant has also agreed to certain modifications proposed by the Chief of Engineers of the War Department. The present plans call for a practical and reasonably adequate development to utilize the head and water available, create a large storage reservoir, and make available for recreational purposes a considerable area now unsuitable for such use, all at a cost which does not appear to be unreasonable.

"Further changes in design may be desirable, but they are minor in character and can be effected if the applicant is able to meet the other requirements of the act." *Re First Iowa Hydro-Electric Cooperative,* 52 PUR (NS) 82, 84.

We believe that the Commission would have been justified in proceeding further at that time with its consideration of the petitioner's application upon all the material facts. Such consideration would have included evidence submitted by the petitioner pursuant to § 9 (b)

---

[5] "SEC. 10. All licenses issued under this Part shall be on the following conditions:

"(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval." 49 Stat. 842, 16 U. S. C. § 803 (a).

of the Federal Power Act [6] as to the petitioner's compliance with the requirements of the laws of Iowa with respect to the petitioner's property rights to make its proposed use of the affected river beds and banks and to divert and use river water for the proposed power purposes, as well as the petitioner's right, within the State of Iowa, to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of the license.  The Commission, however, was confronted at that point with a claim by the State of Iowa that the petitioner must not only meet the requirements for a federal license for the project under the Federal Power Act, but should also present satisfactory evidence of its compliance with the requirements of Chapter 363 of the Code of Iowa, 1939, hereinafter discussed, for a permit from the State Executive Council of Iowa for the same project.

While it now appears, from its brief and the argument in this Court, that it is the opinion of the Federal Power Commission that the requirements of Chapter 363 of the Code of Iowa as to this project have been superseded by those of the Federal Power Act, yet, at the time of the original hearing, the Commission felt that the courts were the appropriate place for the decision on Iowa's contention as to the applicability and effectiveness of Chapter 363

[6] "Sec. 9. That each applicant for a license hereunder shall submit to the commission—

.          .          .          .          .

"(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this Act." 41 Stat. 1068, 16 U. S. C. § 802 (b).

of its Code in relation to this project. The Commission decided, therefore, to proceed no further until that question had been decided by the courts, and dismissed the petitioner's application, without prejudice, in accordance with the following explanation stated in its opinion:

> "The appropriate place for a determination of the validity of such state laws is in the courts and, if we dismiss the application for license on the basis of failure to comply with the requirements of § 9 (b), applicant may seek review of our action and its contentions under § 313 (b) of the Federal Power Act." 52 PUR (NS) 82, 85.

The Commission also expressly found that—

> "The applicant has not presented satisfactory evidence, pursuant to § 9 (b) of the Federal Power Act, of compliance with the requirements of applicable laws of the state of Iowa requiring a permit from the State Executive Council to effect the purposes of a license under the Federal Power Act, and the pending application, as supplemented, should be dismissed without prejudice; . . ." *Id.* at 85.

This action, after all, did not save the Commission from passing on the issue, for the order of dismissal was a ruling upon it, adverse both to the petitioner's contentions and to its own views on the law. The Commission would have been justified in following its own interpretation of the Federal Power Act and proceeding with the merits of the application without requiring the petitioner to submit evidence of its compliance with the terms of Chapter 363, or of any other laws of the State of Iowa, which the Commission held to be inapplicable or to have been superseded by the Federal Power Act.

On the applicant's petition for review of the dismissal, it was affirmed by the United States Court of Appeals for the District of Columbia. 151 F. 2d 20. We then granted certiorari under § 240 (a) of the Judicial Code, 28 U. S. C. § 347, and § 313 (b) of the Federal Power Act,

49 Stat. 860, 16 U. S. C. § 825*l*, because of the importance of the case in applying the Federal Power Act.

The findings made by the Commission on June 3, 1941, in response to the petitioner's declaration of intention are not in question. For the purposes of this application it is settled that the project will affect the navigability of the Cedar, Iowa and Mississippi Rivers, each of which has been determined to be a part of the navigable waters of the United States; will affect the interests of interstate commerce; will flood certain public lands of the United States; and will require for its construction a license from the Commission.[7] The project is clearly within the jurisdiction of the Commission under the Federal Power Act. The question at issue is the need, if any, for the presentation of satisfactory evidence of the petitioner's compli-

---

[7] "Sec. 4. The Commission is hereby authorized and empowered—

.        .        .        .        .

"(e) To issue licenses . . . to any corporation organized under the laws of the United States or any State thereof, . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands . . . of the United States . . .: *Provided further,* That no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting navigation have been approved by the Chief of Engineers and the Secretary of War. Whenever the contemplated improvement is, in the judgment of the Commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the Commission and shall become a part of the records of the Commission: . . ." 49 Stat. 840, 16 U. S. C. § 797 (e). See also, § 23 (b), note 2, *supra.*

ance with the terms of Chapter 363 of the Code of Iowa. This question is put in issue by the petition for review of the order of the Commission which dismissed the application solely on the ground of the failure of the petitioner to present such evidence. The laws of Iowa which that State contends are applicable and require a permit from its Executive Council to effect the purposes of the federal license are all in §§ 7767–7796.1 of the Code of Iowa, 1939, constituting Chapter 363, entitled "Mill Dams and Races." Section 7767 of that chapter is alleged to require the issuance of a permit by the Executive Council of the State and is the one on which the Commission's order must depend. It provides:

> "7767 Prohibition—permit. No dam shall be constructed, maintained, or operated in this state in any navigable or meandered stream for any purpose, or in any other stream for manufacturing or power purposes, nor shall any water be taken from such streams for industrial purposes, unless a permit has been granted by the executive council to the person, firm, corporation, or municipality constructing, maintaining, or operating the same." [8]

To require the petitioner to secure the actual grant to it of a state permit under § 7767 as a condition precedent to securing a federal license for the same project under the Federal Power Act would vest in the Executive Council of Iowa a veto power over the federal project. Such a veto power easily could destroy the effectiveness of the Federal Act. It would subordinate to the control of the State the "comprehensive" planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government.[9]

---

[8] Sections 7771, 7776, 7792 and 7796 of Chapter 363 have a less direct relation to the issue but would be superseded by the Federal Power Act if § 7767 is superseded by it.

[9] See § 10 (a), note 5, *supra;* § 23 (b), note 2, *supra;* and § 4 (e), note 7, *supra.*

The Commission's order of dismissal avoids this extreme result because, instead of charging the petitioner with failure to present satisfactory evidence of the actual grant to it of a state permit, the order charges the petitioner with failure to present satisfactory evidence merely of its "compliance with the requirements of applicable laws of the state of Iowa requiring a permit from the State Executive Council." While this avoids subjecting the petitioner to an arbitrary and capricious refusal of the permit it does not meet the substance of the objection to the order. For example, § 7776 of the State Code requires that "the method of construction, operation, maintenance, and equipment of any and all dams in such waters shall be subject to the approval of the Executive Council." This would subject to state control the very requirements of the project that Congress has placed in the discretion of the Federal Power Commission.[10] A still greater difficulty is illustrated by § 7771. This states the requirements for a state permit as follows:

"7771 When permit granted. If it shall appear to the council that the construction, operation, or

[10] See § 10 (a), note 5, *supra;* and also:

"SEC. 10. All licenses issued under this Part shall be on the following conditions: . . .

"(b) That except when emergency shall require for the protection of navigation, life, health, or property, no substantial alteration or addition not in conformity with the approved plans shall be made to any dam or other project works constructed hereunder . . . without the prior *approval of the Commission;* and any emergency alteration or addition so made shall thereafter be subject to such modification and change *as the Commission may direct.*

"(c) That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain and operate said works as not to impair navigation, and shall conform to such rules and regulations as *the Commission may from time to time prescribe* for the protection of life, health, and property. . . ." 49 Stat. 842, 16 U. S. C. § 803 (b) and (c). (Italics supplied.)

maintenance of the dam will not materially obstruct existing navigation, or materially affect other public rights, will not endanger life or public health, and *any water taken from the stream in connection with the project is returned thereto at the nearest practicable place* without being materially diminished in quantity or polluted or rendered deleterious to fish life, it shall grant the permit, upon such terms and conditions as it may prescribe." (Italics supplied.)

This strikes at the heart of the present project. The feature of the project which especially commended it to the Federal Power Commission was its diversion of substantially all of the waters of the Cedar River near Moscow, to the Mississippi River near Muscatine. Such a diversion long has been recognized as an engineering possibility and as constituting the largest power development foreseeable on either the Cedar or Iowa Rivers.[11] It is this diversion that makes possible the increase in the head of water for power development from a maximum of 35 feet to an average of 101 feet, the increase in the capacity of the plant from 15,000 kw. to 50,000 kw. and its output from 47,000,000 kwh. to 200,000,000 kwh. per year. It is this diversion that led the Federal Power Commission, on January 29, 1944, to make its favorable appraisal of the enlarged project in contrast to its unfavorable appraisal, and to the State's rejection, of the smaller project. It is this feature that brings this project squarely under the Federal Power Act and at the same time gives the project its greatest economic justification.

If a state permit is not required, there is no justification for requiring the petitioner, as a condition of securing its federal permit, to present evidence of the petitioner's com-

---

[11] Report from the Chief of Engineers on the Iowa River and its tributaries made in 1929 covering navigation, flood control, power development and irrigation. H. R. Doc. No. 134, 71st Cong., 2d Sess., 86, 87, 90.

pliance with the requirements of the State Code for a state permit. Compliance with state requirements that are in conflict with federal requirements may well block the federal license. For example, compliance with the state requirement, discussed above, that the water of the Cedar River all be returned to it at the nearest practicable place would reduce the project to the small one which is classified by the Federal Power Commission as "neither desirable nor adequate." Similarly, compliance with the engineering requirements of the State Executive Council, if additional to or different from the federal requirements, may well result in duplications of expenditures that would handicap the financial success of the project. Compliance with requirements for a permit that is not to be issued is a procedure so futile that it cannot be imputed to Congress in the absence of an express provision for it. On the other hand, there is ample opportunity for the Federal Power Commission, under the authority expressly given to it by Congress, to require by regulation the presentation of evidence satisfactory to it of the petitioner's compliance with any of the requirements for a state permit on the state waters of Iowa that the Commission considers appropriate to effect the purposes of a federal license on the navigable waters of the United States. This evidence can be required of the petitioner upon the remanding of this application to the Commission.

In the Federal Power Act there is a separation of those subjects which remain under the jurisdiction of the States from those subjects which the Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the Act establishes a dual system of control. The duality of control consists merely of the division of the common enterprise between two cooperating agencies of government, each with final authority in its own jurisdiction. The duality does not require two

agencies to share in the final decision of the same issue. Where the Federal Government supersedes the state government there is no suggestion that the two agencies both shall have final authority. In fact a contrary policy is indicated in §§ 4 (e), 10 (a), (b) and (c), and 23 (b).[12] In those sections the Act places the responsibility squarely upon federal officials and usually upon the Federal Power Commission. A dual final authority, with a duplicate system of state permits and federal licenses required for each project, would be unworkable. "Compliance with the requirements" of such a duplicated system of licensing would be nearly as bad. Conformity to both standards would be impossible in some cases and probably difficult in most of them.[13] The solution adopted by Congress, as to what evidence an applicant for a federal license should submit to the Federal Power Commission, appears in § 9 of its Act. It contains not only subsection (b)[14] but also subsections (a) and (c).[15] Section 9 (c) permits

---

[12] See notes 7, 5, 10 and 2, *supra.*

[13] In addition to those given in the text, another example of conflict between the project requirements of the Iowa statutes and those of the Federal Power Act appears in § 7792 of the Iowa Code. That section requires the beginning of construction of the project dam or raceway within one year and the completion of the plant within three years after the granting of the permit. This conflicts with § 13 of the Federal Power Act which makes this largely discretionary with the Federal Power Commission but generally contemplates that the construction be commenced within two years from the date of the license. So in § 7793 of the Iowa Code, the life of a permit conflicts with the term of a license under § 6 of the Federal Power Act.

[14] See note 6, *supra.*

[15] "SEC. 9. That each applicant for a license hereunder shall submit to the commission—

"(a) Such maps, plans, specifications, and estimates of cost as may be required for a full understanding of the proposed project. Such maps, plans, and specifications when approved by the commission shall be made a part of the license; and thereafter no change shall be made

the Commission to secure from the applicant "Such additional information as the commission may require." This enables it to secure, *in so far as it deems it material,* such parts or all of the information that the respective States may have prescribed in state statutes as a basis for state action. The entire administrative procedure required as to the present application for a license is described in § 9 and in the Rules of Practice and Regulations of the Commission.[16]

in said maps, plans, or specifications until such changes shall have been approved and made a part of such license by the commission.

.          .          .          .          .

"(c) Such additional information as the commission may require." 41 Stat. 1068, 16 U. S. C. § 802 (a) and (c).

[16] These rules and regulations are issued pursuant to §§ 303, 308 and 309, 49 Stat. 855, 858, 16 U. S. C. §§ 825b, 825g and 825h, interpreting §§ 4 and 9 of the Federal Power Act. Federal Power Commission Rules of Practice and Regulations, 1938, §§ 4.40–4.51, 18 C. F. R. §§ 4.40–4.51. They cover the field so fully as to leave no purpose to be served by filing comparable information required in some alternative form under state laws as a basis for a state permit. Exhibits D and E, required by § 4.41 of the regulations, are to satisfy § 9 (b) of the Federal Power Act and have to do especially with property rights in the use of water under the state laws and do not alter the legal situation presented by the Act itself. These exhibits are described as follows:

"*Exhibit D.*—Evidence that the applicant has complied with the requirements of the laws of the State or States within which the project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business, necessary to effect the purposes of the license applied for, including a certificate of convenience and necessity, if required. This evidence shall be accompanied by a statement of the steps that have been taken and the steps that remain to be taken to acquire franchise or other rights from States, counties, and municipalities before the project can be completed and put into operation.

"*Exhibit E.*—The nature, extent, and ownership of water rights which the applicant proposes to use in the development of the

The securing of an Iowa state permit is not in any sense a condition precedent or an administrative procedure that must be exhausted before securing a federal license. It is a procedure required by the State of Iowa in dealing with its local streams and also with the waters of the United States within that State in the absence of an assumption of jurisdiction by the United States over the navigability of its waters. Now that the Federal Government has taken jurisdiction of such waters under the Federal Power Act, it has not by statute or regulation added the state requirements to its federal requirements.

The State of Iowa, in its petition to intervene in the proceedings before the Commission, stated in relation to the proposed diversion of water from the Cedar River to the Mississippi: "said diversion would be in direct violation of the provisions of section 7771, Code of Iowa 1939." Also, in the State's motion to intervene in the proceedings before the Court of Appeals, it alleged that "By reason of said provisions of law [§§ 7767 and 7771, Code of Iowa, 1939] and the diversion of water involved in the proposed project of petitioner, the executive council of the state of Iowa could not lawfully grant a permit for the erection of the dam proposed." Furthermore, the Executive Council, which includes the Governor of the State, on July 5,

---

project covered by application, together with satisfactory evidence that the applicant has proceeded as far as practicable in perfecting its rights to use sufficient water for proper operation of the project works. A certificate from the proper State agency setting forth the extent and validity of the applicant's water rights shall be appended if practicable. In case the approval or permission of one or more State agencies is required by State law as a condition precedent to the applicant's right to take or use water for the operation of the project works, duly certified evidence of such approval or permission, or a showing of cause why such evidence cannot be reasonably submitted shall also be filed. When a State certificate is involved, one certified copy and three uncertified copies shall be submitted." Federal Power Commission Rules of Practice and Regulations, effective June 1, 1938, pp. 21–22.

1944, adopted a resolution directing the Attorney General of Iowa to intervene in this case before that court and "thereby take steps to sustain the said order of the Federal Power Commission [dismissing the petitioner's application for a federal license]" because "it is vital to the interests of the State of Iowa that the said order of the Commission be sustained." This demonstrates that the State of Iowa not only is opposed to the granting of a state permit but is opposed also to the granting of a federal license for the project. This opposition is based at least in part on the ground that the state statute, as interpreted by the state officials, expresses a policy opposed to the diversion of water from one stream to another in Iowa under such circumstances as the present.

Accepting this as the meaning of § 7771 of the Iowa Code brings us to consideration of the effect of the Federal Power Act upon it and the related state statutes. We find that when that Act is read in the light of its long and colorful legislative history, it discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the Nation and a determination to avoid unconstitutional invasion of the jurisdiction of the States. The solution reached is to apply the principle of the division of constitutional powers between the State and Federal Governments. This has resulted in a dual system involving the close integration of these powers rather than a dual system of futile duplication of two authorities over the same subject matter.

The Act leaves to the States their traditional jurisdiction subject to the admittedly superior right of the Federal Government, through Congress, to regulate interstate and foreign commerce, administer the public lands and reservations of the United States and, in certain cases, exercise authority under the treaties of the United States. These sources of constitutional authority are all applied in

the Federal Power Act to the development of the navigable waters of the United States.[17]

The closeness of the relationship of the Federal Government to these projects and its obvious concern in maintaining control over their engineering, economic and financial soundness is emphasized by such provisions as those of § 14 authorizing the Federal Government, at the

---

[17] The Federal Government took its greatest step toward exercising its jurisdiction in this field by authorizing federal licenses, under the Federal Water Power Act of 1920 (41 Stat. 1063), for terms of 50 years for the development of water power in the navigable waters of the United States. That Act was limited in 1921 by the exclusion from it of water power projects in national parks or national monuments. 41 Stat. 1353. The Commission was reorganized so as to improve its administrative capacity in 1930. 46 Stat. 797. The Act was generally revised and perfected on August 26, 1935, 49 Stat. 803, when it received the name of the Federal Power Act. It was then made Part I of Title II of the Public Utility Act of 1935.

This last step was shortly after the decision of this Court in *United States* v. *West Virginia*, 295 U. S. 463, and it has served to clarify the law as it existed prior to that decision. Among other things, this last step amended § 23 so as expressly to require a federal license for every water power project in the navigable waters of the United States. It also made mandatory, instead of discretionary, the filing with the Federal Power Commission of a declaration of intention by anyone intending to construct a project in non-navigable waters over which Congress had jurisdiction under its authority to regulate commerce. It continued its recital of permission to construct such projects upon compliance with the state laws, rather than with the Federal Power Act, provided the projects were not in navigable waters of the United States, did not affect the interests of interstate or foreign commerce and did not affect the public lands or reservations of the United States. These amendments sharpened the line between the state and federal jurisdictions and helped to make it clear that the Federal Government was assuming responsibility through the Federal Power Commission for the granting of appropriate licenses for the development of water power resources in the navigable waters of the United States. See also the rapid development of federal projects shown in the Annual Reports of the Federal Power Commission 1921–1945.

expiration of a license, to take over the licensed project by payment of "the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken," plus an allowance for severance damages. The scope of the whole program has been further aided, in 1940, by the definition given to navigable waters of the United States in *United States* v. *Appalachian Power Co.*, 311 U. S. 377. "Students of our legal evolution know how this Court interpreted the commerce clause of the Constitution to lift navigable waters of the United States out of local controls and into the domain of federal control. *Gibbons* v. *Ogden,* 9 Wheat. 1, to *United States* v. *Appalachian Power Co.,* 311 U. S. 377." *Northwest Airlines* v. *Minnesota,* 322 U. S. 292, 303.

It was in the light of these developments that this petitioner, in April, 1941, made application for a federal license for this enlarged project. This project thus illustrates the kind of a development, in relation to interstate commerce and to the navigable waters of the United States, that is brought forth by the new recognition of its value when viewed from the comprehensive viewpoint of the Federal Power Commission. Until 1941, this enlarged project had remained dormant at least from the time when its value was recognized in the report to Congress filed by the War Department in 1929.[18]

Further light is thrown upon the meaning of the Federal Power Act by the statement, made by Representative William L. LaFollette of Washington, a member of the Special Committee on Water Power, which reported the bill which later became the Federal Water Power Act of 1920. In the debate which led to the insertion in § 9 (b)

---

[18] H. R. Doc. No. 134, 71st Cong., 2d Sess., reflecting the recommendations of the District Engineer, pp. 8–90; Division Engineer, p. 90; Mississippi River Commission, pp. 90–93; Board of Engineers for Rivers and Harbors, pp. 3–8; and the Chief of Engineers, pp. 1–3. See especially pp. 86, 87, 90.

of the reference to state laws as to the bed and banks of streams, he said:

> "The property rights are within the State.  It can dispose of the beds, or parts of them, regardless of the riparian ownership of the banks, if it desires to, and that has been done in some States.  If we put in this language, which is practically taken from that Supreme Court decision [*United States* v. *Cress,* 243 U. S. 316], as to the property rights of the States as to the bed and the banks and to the diversion of the water, then it is sure that we have not infringed any of the rights of the States in that respect, or any of their rules of property, and *we are trying in this bill above everything else to overcome a divided authority and pass a bill that will make it possible to get development.*  We are earnestly trying not to infringe the rights of the States.  If possible we want a bill that can not be defeated in the Supreme Court because of omissions, because of the lack of some provision that we should have put in the bill to safeguard the States."  56 Cong. Rec. 9810.  (Italics supplied.)

As indicated by Representative LaFollette, Congress was concerned with overcoming the danger of divided authority so as to bring about the needed development of water power and also with the recognition of the constitutional rights of the States so as to sustain the validity of the Act.  The resulting integration of the respective jurisdictions of the State and Federal Governments is illustrated by the careful preservation of the separate interests of the States throughout the Act, without setting up a divided authority over any one subject.[19]

---

[19] Instances of such provisions are the following: § 4 (a) and (c), cooperation of the Commission with the executive departments and other agencies of the State and National Governments is required in the investigation of such subjects as the utilization of water resources, water-power industry, location, capacity, development costs and the relation to markets of power sites, and the fair value of power.  § 4 (f), notice of application for a preliminary permit is to go to any State or municipality likely to be interested.  § 7 (a), in

Sections 27 and 9 are especially significant in this regard. Section 27 expressly "saves" certain state laws relating to property rights as to the use of water, so that these are not superseded by the terms of the Federal Power Act. It provides:

"SEC. 27. That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." 41 Stat. 1077, 16 U. S. C. § 821.

Section 27 thus evidences the recognition by Congress of the need for an express "saving" clause in the Federal Power Act if the usual rules of supersedure are to be overcome. Sections 27 and 9 (b) were both included in the original Federal Water Power Act of 1920 in their present form. The directness and clarity of § 27 as a "saving" clause and its location near the end of the Act emphasizes the distinction between its purpose and that of § 9 (b) which is included in § 9, in the early part of the Act, which deals with the marshalling of information for the consideration of a new federal license. In view of the use by Congress of such an adequate "saving" clause in § 27, its failure to use similar language in § 9 (b) is persuasive that § 9 (b) should not be given the same effect as is given to § 27.

The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation,

issuing permits and licenses preference is to be given to States and municipalities. § 10 (e), licenses to States and municipalities under certain circumstances shall be issued and enjoyed without charge. § 14, a right is reserved not only to the United States but to any State or municipality to take over any licensed project at any time by condemnation and payment of just compensation. §§ 19 and 20, regulation of service and rates is preserved to the States.

use or distribution of water in irrigation or for municipal or other uses of the same nature. It therefore has primary, if not exclusive, reference to such proprietary rights. The phrase "any vested right acquired therein" further emphasizes the application of the section to property rights. There is nothing in the paragraph to suggest a broader scope unless it be the words "other uses." Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes. This was so held in an early decision by a District Court, relating to § 27 and upholding the constitutionality of the Act, where it was stated that "a proper construction of the act requires that the words 'other uses' shall be construed ejusdem generis with the words 'irrigation' and 'municipal.' " *Alabama Power Co. v. Gulf Power Co.*, 283 F. 606, 619.

This section therefore is thoroughly consistent with the integration rather than the duplication of federal and state jurisdictions under the Federal Power Act. It strengthens the argument that, in those fields where rights are not thus "saved" to the States, Congress is willing to let the supersedure of the state laws by federal legislation take its natural course.[20]

---

[20] The legislative history of § 27 confirms these conclusions. The language is similar to that of § 8 of the Reclamation Act of 1902, 32 Stat. 390, 43 U. S. C. § 383, which provides, "nothing [in several listed sections] in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, . . ."

This restricted clause appeared in a modified and broader form in the Ferris Public Lands Bill of 1916, H. R. No. 408, 64th Cong., 1st Sess.:

"SEC. 13. That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws

Section 9 (b)[21] does not resemble § 27. It must be read with § 9 (a) and (c).[22] The entire section is devoted to securing adequate information for the Commission as to pending applications for licenses. Where § 9 (a) calls for engineering and financial information, § 9 (b) calls for legal information. This makes § 9 (b) a natural place in which to describe the evidence which the Commission shall require in order to pass upon applications for federal licenses. This makes it a correspondingly unnatural place to establish by implication such a substantive policy as that contained in § 27 and which, in accordance with the contentions of the State of Iowa, would enable Chapter 363 of the Code of Iowa, 1939, to remain in effect although in conflict with the requirements of the Federal Power Act. There is nothing in the express language of § 9 (b) that requires such a conclusion.

It does not itself require compliance with any state laws. Its reference to state laws is by way of suggestion to the

---

of any State relating to the control, appropriation, use, or distribution of water."

It also had appeared as § 14 of the Ferris Bill of 1914, H. R. No. 16673, 63d Cong., 2d Sess., as follows:

"SEC. 14. That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired thereunder."

Discussion in Congress further emphasized the purely proprietary sense in which this language was used. 51 Cong. Rec. 13630–13631.

The clause reappeared in the Bill which became the Federal Water Power Act and was there enacted into the law in its present form. The use, in § 27 of the Federal Power Act, of language having a limited meaning in relation to proprietary rights under the reclamation law and in public land bills, carries that established meaning of the language into the Federal Power Act in the absence of anything in the Act calling for a different interpretation of the language.

[21] See note 6.

[22] See note 15.

Federal Power Commission of subjects as to which the Commission may wish some proof submitted to it of the applicant's progress. The evidence required is described merely as that which shall be "satisfactory" to the Commission. The need for compliance with applicable state laws, if any, arises not from this federal statute but from the effectiveness of the state statutes themselves.

When this application has been remanded to the Commission, that Commission will not act as a substitute for the local authorities having jurisdiction over such questions as the sufficiency of the legal title of the applicant to its riparian rights, or as to the validity of its local franchises, if any, relating to proposed intrastate public utility service. Section 9 (b) says that the Commission may wish to have "satisfactory evidence" of the progress made by the applicant toward meeting local requirements but it does not say that the Commission is to assume responsibility for the legal sufficiency of the steps taken. The references made in § 9 (b) to beds and banks of streams, to proprietary rights to divert or use water, or to legal rights to engage locally in the business of developing, transmitting and distributing power neither add anything to nor detract anything from the force of the local laws, if any, on those subjects. In so far as those laws have not been superseded by the Federal Power Act, they remain as applicable and effective as they were before its passage. The State of Iowa, however, has sought to sustain the applicability and validity of Chapter 363 of the Code of Iowa in this connection, on the ground that the Federal Power Act, by the implications of § 9 (b), has recognized this chapter of Iowa law as part of a system of dual control of power project permits, cumbersome and complicated though it be. If it had been the wish of Congress to make the applicant obtain consent of state as well as federal authorities to each project, the simple thing would

have been to so provide. In the course of the long debate on the legislation it was proposed at one time to provide for some such consent in § 9 (b).

For example, in the Shields Bill, S. No. 1419, 65th Cong., 2d Sess., in 1917, a proviso was proposed:

> "That before the permit shall be granted under this Act, the permittee must first obtain, in such manner as may be required by the laws of the States, *the consent of the State or States* in which the dam or other structure for the development of the water power is proposed to be constructed." (Italics supplied.)

This proviso was not enacted into law but it illustrates the concreteness with which the proposal was before Congress. In 1918, when Representative Mondell, of Wyoming, successfully defended the present language against amendment, he stated the purposes of § 9 (b) as follows:

> "There are two controlling reasons for the insertion of this paragraph. The first, from the standpoint of water-power legislation, is that *the water-power commission shall have the benefit of all of the information* which the States possess relative to the condition of water supply at the point of proposed diversion. That is a very important reason for a provision of this kind. . . . The second reason is so that the bill shall carry with it *notice to the commission that they must proceed in accordance with the State laws, which they must do in any event, whether the provision were in the bill or not.*" 56 Cong. Rec. 9813–9814. (Italics supplied.)

The purpose of this section as thus explained is consistent with the contention of the Commission in this case. It provides for presentation of information to the federal commission and protects the constitutional rights of the States. This explanation does not support the contention of the State of Iowa that § 9 (b) amounts to the subjection of the federal license to requirements of the state law on the same subject. The inappropriateness of such

an interpretation is apparent in the light of the circumstances which culminated in the passage of the Federal Water Power Act in 1920. The purposes of the Act were then so generally known as to have made such a restrictive interpretation impossible and a denial of it unnecessary. It was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.

It was a major undertaking involving a major change of national policy.[23] That it was the intention of Congress

---

[23] The nation-wide drive for the passage of this legislation dates back at least to the administration of Theodore Roosevelt and to the enthusiastic support of "the conservationists" led by Gifford Pinchot, as Chief of the Division of Forestry.

"With all its faults the Federal Water Power Act of 1920, marked a great advance. It established firmly the principle of federal regulation of water power projects, limited licenses to not more than fifty years, and provided for Government recapture of the power at the end of the franchise.

"For the first time, the Act of 1920 established a national policy in the use and development of water power on public lands and navigable streams." Pinchot, The Long Struggle for Effective Federal Water Power Legislation (1945), 14 Geo. Wash. L. Rev. 9, 19. See also, Kerwin, Federal Water-Power Legislation, c. VI.

The present Act was distinctly an effort to provide federal control over and give federal encouragement to water power development. It grew out of a bill prepared by the Secretaries of War, Interior and Agriculture. It was recommended by a Special Committee on Water Power created in the House of Representatives at the suggestion of President Wilson. See Statement by Representative Sims, Chairman of the Committee on Water Power, 56 Cong. Rec. 9797–9798. The bill was to provide "a method by which the water powers of the

to secure a comprehensive development of national resources and not merely to prevent obstructions to navigation is apparent from the provisions of the Act, the statutory scheme of which has been several times reviewed and approved by the courts.[24]

The detailed provisions of the Act providing for the federal plan of regulation leave no room or need for conflicting state controls.[25] The contention of the State of

country, wherever located, can be developed by public or private agencies under conditions which will give the necessary security to the capital invested and at the same time protect and preserve every legitimate public interest. . . . The problems are national, rather than local; they transcend State lines and cannot be handled adequately except by or in conjunction with national agencies." Statement by David F. Houston, Secretary of Agriculture, quoted in H. R. Rep. No. 61, 66th Cong., 1st Sess., p. 5.

[24] *New Jersey* v. *Sargent*, 269 U. S. 328; *United States* v. *Appalachian Power Co.*, 311 U. S. 377; *Clarion River Power Co.* v. *Smith*, 59 F. 2d 861, certiorari denied, 287 U. S. 639; *Alabama Power Co.* v. *McNinch*, 94 F. 2d 601; *Pennsylvania Water & Power Co.* v. *Federal Power Commission*, 74 App. D. C. 351, 123 F. 2d 155, certiorari denied, 315 U. S. 806; *Alabama Power Co.* v. *Federal Power Commission*, 75 U. S. App. D. C. 315, 128 F. 2d 280, certiorari denied, 317 U. S. 652; *Puget Sound Power & Light Co.* v. *Federal Power Commission*, 78 U. S. App. D. C. 143, 137 F. 2d 701; *Wisconsin Public Service Corp.* v. *Federal Power Commission*, 147 F. 2d 743, certiorari denied, 325 U. S. 880; *Georgia Power Co.* v. *Federal Power Commission*, 152 F. 2d 908.

[25] Sections 4 (e) and 10 (a), comprehensive plans required; §§ 4 (f) and 5, preliminary permits; § 4 (g), investigation of power resources; § 6, license term of 50 years; § 7 (a) development of water resources on a national basis; § 7 (b), developments by the United States itself; § 13, prompt construction required; § 14, recapture of projects and payment for them by the Government upon expiration of licenses, thus giving the Government a direct interest in and reason for control of every feature of each licensed project; § 21, federal powers of condemnation vested in licensee; and § 28, prohibition of amendment or repeal of licenses.

Iowa is comparable to that which was presented on behalf of 41 States and rejected by this Court in *United States* v. *Appalachian Power Co.,* 311 U. S. 377, 404–405, 426–427, where this Court said:

> "The states possess control of the waters within their borders, 'subject to the acknowledged jurisdiction of the United States under the Constitution in regard to commerce and the navigation of the waters of rivers.' It is this subordinate local control that, even as to navigable rivers, creates between the respective governments a contrariety of interests relating to the regulation and protection of waters through licenses, the operation of structures and the acquisition of projects at the end of the license term. But there is no doubt that the United States possesses the power to control the erection of structures in navigable waters.
>
> .    .    .    .    .
>
> "The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the Federal Government. The license conditions to which objection is made have an obvious relationship to the exercise of the commerce power. Even if there were no such relationship the plenary power of Congress over navigable waters would empower it to deny the privilege of constructing an obstruction in those waters. It may likewise grant the privilege on terms. It is no objection to the terms and to the exertion of the power that 'its exercise is attended by the same incidents which attend the exercise of the police power of the states.' The Congressional authority under the commerce clause is complete unless limited by the Fifth Amendment."

It is the Federal Power Commission rather than the Iowa Executive Council that under our constitutional Government must pass upon these issues on behalf of the people of Iowa as well as on behalf of all others.

We accordingly reverse the judgment of the court below with directions to remand the case to the Federal Power Commission for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

This case does not present one of those large constitutional issues which, because they are so largely abstract, have throughout its history so often divided the Court. The controversy, as I understand it, is concerned with the proper administration of a law in which Congress has recognized the interests of the States as well as of the United States and has entrusted the proper adjustment of these nation-State relations to the interrelated functions of the Federal Power Commission and the courts.

We are all agreed that Congress has the constitutional power to promote a comprehensive development of the nation's water resources and that it has exercised its authority by the Federal Power Act. 41 Stat. 1063, 49 Stat. 838; 16 U. S. C. §§ 791 (a) *et seq.* See *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53; *New Jersey* v. *Sargent,* 269 U. S. 328; *United States* v. *Appalachian Power Co.,* 311 U. S. 377. And in view of Congress' power, of course this enactment overrides all State legislation in conflict with it. But the national policy for water power development formulated by the Federal Power Act explicitly recognizes regard for certain interests of the States as part of that national policy. This does not imply that general, uncritical notions about so-called "States' rights" are to be read into what Congress has written. It does mean that we must adhere to the express Congressional mandate that the public interest which

underlies the Federal Power Act involves the protection of particular matters of intimate concern to the people of the States in which proposed projects requiring the sanction of the Federal Power Commission are to be located. By § 9 (b) of the Act, 41 Stat. 1063, 1068; 16 U. S. C. § 802 (b),[1] Congress explicitly required that before the Commission can issue a license for the construction of a hydro-electric development, such as the proposed project of the petitioner, the Commission must have "satisfactory evidence that the applicant has complied with the requirements of the laws of the State" in reference to the matters enumerated.

Whether the Commission has such "satisfactory evidence" necessarily depends upon what the requirements of State law are. In turn, what the requirements of State law are often depends upon the appropriate but unsettled construction of State law. And so, the Commission may well be confronted, as it was in this case, with the necessity of determining what the State law requires before it can determine whether the applicant has satisfied it, and, therefore, whether the condition for exercising the Commission's power has been fulfilled.

To safeguard the interests of the States thus protected by § 9 (b), Congress has directed that notice be given to the State when an application has been filed for a license, the granting of which may especially affect a State. § 4 (f), 49 Stat. 838, 841; 16 U. S. C. § 797 (f). If a State does not challenge the claim of an applicant, the evidence

---

[1] "SEC. 9. That each applicant for a license hereunder shall submit to the commission . . .

(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this Act."

submitted by the applicant, if found to be satisfactory by the Commission, has met the demands of § 9 (b), and a State cannot thereafter challenge the Commission's determination. But a real problem in administration is presented to the Power Commission when a State does intervene and claims that the applicant has not complied with its lawful requirements. For, before the Commission can meet the duty placed on it by § 9 (b), it must ascertain the scope and meaning of the State law. Suppose the State law is not clear or is susceptible of different constructions and has received no construction by the only authoritative source for the interpretation of State laws, namely, the highest court of the State. Must the Federal Power Commission give an independent interpretation of the laws of the State? This is not to suggest an unreal or hypothetical situation. The Federal Power Commission submitted here a compilation of laws relating to State requirements relevant under § 9 (b) for not less than thirty States. Are the lawyers of the Commission to make themselves the originating interpreters of the laws of these States? Are they to construe, for instance, the laws of New Jersey and Oklahoma and Arizona and Illinois when the courts of those States have not spoken? And if they do and the State appeals from the decision, must the Court of Appeals for the District of Columbia become the interpreter of these various laws? Finally, in the event of a further appellate review is this Court to construe State legislation without guidance by the State courts? Time out of mind, and in a variety of situations, this Court has admonished against the avoidable assumption by this Court of the independent construction of State legislation. See, *e. g., Gilchrist* v. *Interborough Co.,* 279 U. S. 159, 207–209; Brandeis, J., dissenting, in *Railroad Comm'n* v. *Los Angeles R. Co.,* 280 U. S. 145, 158, 164–66. It is pertinent to recall the classic statement of the reason for leaving to the controlling interpretation of local courts the mean-

ing of local law: "to one brought up within it, varying emphasis, tacit assumptions, unwritten practices, a thousand influences gained only from life, may give to the different parts wholly new values that logic and grammar never could have got from the books." *Diaz* v. *Gonzalez,* 261 U. S. 102, 106. If it has been deemed unwise to throw upon this Court the burden of construing local legislation when the construction could by appropriate procedure be had from the States, it seems odd that we should reject this as a rule of administration adopted by the Power Commission.

That is all that the Commission has done in this case. It has said, in effect: "We do not know what the Iowa law demands of the applicant. Iowa has a right to make certain demands under § 9 (b) and until they are met we are not empowered to grant a license to the applicant. But we cannot tell whether they have been met, because the meaning of the Iowa statutes has not been determined, as it easily can be determined, by an appropriate action in the Iowa courts. Only after such an authoritative pronouncement can we know what our obligation under the statute may be." The Court of Appeals for the District of Columbia thought that such procedure made sense. It seems to have said: "The Commission doesn't know what the Iowa law requires, and neither do we. For we cannot tell what it requires until the Iowa Supreme Court tells us what it requires. And an adjudication of that issue can be readily secured if the applicant will proceed along the easy path provided by Iowa for obtaining such an adjudication." 151 F. 2d 20. See Iowa Laws, 1943, c. 278, § 306 and *Lloyd* v. *Ramsay,* 192 Iowa 103, 116–17, 183 N. W. 333. Even we cannot construe the requirements of Iowa law in the absence of a determination by the Iowa Supreme Court. And in much more conventional types of litigation we have evolved the procedure whereby federal litigation is stayed until the State law is authoritatively

determined by a State court. *E. g., Railroad Commission* v. *Pullman Co.,* 312 U. S. 496; *Spector Motor Co.* v. *McLaughlin,* 323 U. S. 101; *A. F. of L.* v. *Watson,* 327 U. S. 582.

What reason of policy is there for not approving this mode of adjusting interests that involve a regard for both federal and State enactments? The Federal Power Commission which devised this procedure has not been an unzealous guardian of the national interests. *E. g., Federal Power Comm'n* v. *Natural Gas Pipeline Co.,* 315 U. S. 575; *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591.

It is no answer to suggest that the Attorney-General of Iowa at the bar of this Court expressed a view of the Iowa statute which would make obedience to it needless because of conflict with the provisions of the Federal Power Act. The Attorney-General is not the judicial organ of the State of Iowa. This Court does not always take the interpretation by the Attorney-General of the United States of a federal statute. It should not take the view of the Attorney-General of Iowa as authoritative on a statute not construed by the Supreme Court of Iowa when we are called upon to make the adjustment in federal-State relations which Congress has enjoined in § 9 (b). After all, advocates, including advocates for States, are like managers of pugilistic and election contestants in that they have a propensity for claiming everything. Before conflict can be found between federal and State legislation, construction must be given the State legislation. Avoidance of conflict is itself an important factor relevant to construction. And so, construction of State legislation relating to the matters dealt with in the Federal Power Act is subtle business and a subtlety peculiarly within the duty, skill, and understanding of State judges.

If it be said that the procedure for which the Federal Power Commission contends may take time, there is no

assurance that a contested case like this will not take just as much time hereafter. The Commission must pass independently on an unconstrued State statute; its construction may then come before the Court of Appeals for the District and eventually before this Court. Even then the possibility remains that this Court's decision will be followed by one in the State court ruling, as has not been unknown, that this Court's interpretation was in error. In any event, mere speed is not a test of justice. Deliberate speed is. Deliberate speed takes time. But it is time well spent.

With due respect, I have not been able to discover an adequate answer to the position of the Federal Power Commission, thus summarized in the Solicitor-General's brief:

> "Unless Section 9 (b) is to be given no effect whatever, some evidence of compliance with at least some state laws is a prerequisite to the issuance of a federal license, and the view of the court below, that there is no occasion, in this case, to anticipate conflicts between state and federal authority and the consequent invalidity of the state law, is not an unreasonable one. 'To predetermine, even in the limited field of water power, the rights of different sovereignties, pregnant with future controversies, is beyond the judicial function.' *United States* v. *Appalachian Electric Power Co.,* 311 U. S. 377, 423. Here petitioner, since the modification of its plans, has given the State Executive Council and the Iowa courts no opportunity to express their views on its proposed project with reference to matters which may be peculiarly of local concern; without such an expression, it is difficult to assess the propriety of what is only an anticipated exercise of the State's power."

Accordingly, I think that the judgment should be affirmed.