**PUBLIC SERVICE COMMISSION OF NEW YORK et al. v. SECURITIES AND EXCHANGE COMMISSION.**

No. 179, Docket 20892.

Circuit Court of Appeals, Second Circuit.

March 5, 1948.

---

Raymond J. McVeigh, of New York City, Sherman C. Ward, of Albany, N.Y. (Frank C. Bowers, of New York City, and George Kenny, and Richard Llope, both of Albany, N.Y. of counsel), for Public Service Commission.

Samuel A. Hirshowitz, of New York City, Nathaniel L. Goldstein, Atty. Gen., of State of New York, (Wendell P. Brown, Sol. Gen. of Albany, N.Y., of counsel), for Secretary of State.

Roger S. Foster, of Philadelphia, Pa., Sidney H. Willner, Associate Sol., Harry G. Slater, Chief Counsel, Public Utilities Division, and Solomon Freedman, and Alfred Hill, Attys., Securities and Exchange Commission, all of Washington 25, D. C., for Securities & Exchange Commission.

Milton Pollack and Unger & Pollack, all of New York City, for committee of preferred shareholders of Long Island Lighting Co.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order under § 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e), which approved a plan of reorganization of the Kings County Lighting Company, an intrastate operating public utility corporation, substantially all of whose common stock was owned by the Long Island Lighting Company, a "registered holding company" under the Act. Only two questions are at issue: (1) Whether the consent of the Public Service Commission of New York [1] is necessary to the approval of a plan presented by a subsidiary company of a "registered holding company" under subdivision 11(e); and (2) whether the plan approved by the SEC is "fair and equitable" and "appropriate to effectuate the provisions of § 11." On July 21, 1945, the Kings County Company filed with the PSC a petition, asking its approval of a plan for the reduction of its capital stock, and for an issue of new common and preferred shares. This the PSC refused to approve on February 5, 1946; but meanwhile, on August 25, 1945, the Kings County Company had filed a plan with the SEC under § 11 (e). After the PSC had refused its approval of the petition, the Kings County Company filed with it an amended petition on April 16, 1946, which it also filed with the SEC as an amendment to its original plan. The SEC held public hearings on this amended plan, and on December 13,

---

[1] For brevity we shall speak of this commission as the PSC and of the Securities and Exchange Commission as the SEC.

1946, disapproved it; but declared that it would approve it with certain specified amendments. The Kings County Company incorporated the suggested amendments on January 6, 1947, and on the 9th, the SEC approved the plan in this form and applied to the District Court for an order to carry it out. The order granted on that application is the order on appeal. On March 6, 1947, the PSC disapproved the amended petition before it, and the SEC so advised the judge, who had the amended plan still under consideration, which he later approved, as we have just said.

The Kings County Company had had outstanding three issues of preferred shares of a total par value of $4,400,000, and 50,000 shares of common stock without par value, having a "stated value of $2,000,000." The amended petition before the PSC and the amended plan before the SEC each proposed to substitute for these securities preferred shares of $2,200,000 par value, and 440,000 common shares without par value, having a "stated value of $2,200,000." All these securities were to be issued to the old preferred shareholders except seven and one-half per cent of the new common shares, which were to go to the old common shareholders. The PSC found that there was no equity in the Company's assets above the claim of the preferred shares if the accumulated unpaid dividends were included, and for that reason refused to approve the issue of seven and one-half per cent of the new common shares to the old common shareholders. The only difference between the two commissions upon the merits of the plan is whether this feature is "fair and equitable." The SEC did not differ as to the appraised value of the assets, but it did think that increased future earnings of the Company which were reasonably to be expected, gave a value to its assets above the preferred shares, which was fairly represented by seven and one-half per cent of the new common shares. It forecast an average net income of $326,500 a year, although the income of the Company for the year 1946 had been only $182,700. It now relies in part upon the fact that on April 6, 1947, the PSC had approved a proposed tariff increase which would have provided for the Company an income of $331,400.

The first position of the PSC is that § 7(g) of the Act, 15 U.S.C.A. § 79g(g), makes compliance with the laws of New York a condition upon plans initiated by a company under § 11(e). It calls attention to the fact that the SEC has itself recognized in several of its decisions [2] that other subsections of § 7 apply to the issue of securities provided for in such plans; and it can find no reason to except subsection (g). Moreover, it argues that "compliance" with the laws of New York cannot be "effected" by a decision of the SEC, but that it is part of those laws that only the PSC shall decided what does, and what not, "effect" compliance. In short, its position is that, so far as the laws of New York may impinge upon a plan, it has a veto. Further it argues that, since the plan at bar by its own terms provided for approval by the PSC, the plan which the judge approved was not the plan which the Company had submitted, and that therefore he in effect amended it before he approved it, which he had no power to do as he himself declared. The only lawful course for him was to remand the proceeding to the SEC for resubmission to the Company.

We will take up the last objection first. We may assume for argument that the judge's power was limited to an approval or a rejection of the plan, as it stood. He held that, nevertheless, the condition that the plan should be submitted to the PSC for its approval was not an "essential" part of the plan, and that for this reason he was free to disregard it. In this he was right, not indeed because he would have been free to change any of those provisions for the issue of securities or the alteration of shareholders' rights which made up the plan, which he thought not to be "essential"; but because, as we shall show, § 11(e) did not require the consent of the PSC, and because submission to that commission was not part of the plan at all; but, as it itself declared, only one of the

[2] In Re Derby Gas & Electric Corp., 9 S.E.C.Rep. 686, 712; In Re Jacksonville Gas Co., 11 S.E.C.Rep. 449, 458, 471, 472; In Re Puget Sound Light & Power Co., 13 S.E.C.Rep. 225.

"steps to be taken to make the amended plan effective."

That the consent of the PSC was not such a step appears for the following reasons. Section 11 starts with imposing upon the SEC the "duty" of ascertaining how far holding companies can be "simplified" and the "voting power fairly and equitably distributed"; and § 11(b) vests it with power to accomplish these ends. Section 11(e) makes it possible for the Company to forestall action by the Commission by taking the initiative; subject to such regulations as the Commission may promulgate, it may "submit a plan * * * for the purpose of enabling" it "to comply with the provisions of subsection (b)." Such a submission is a substitute for the performance of the Commission's "duty"; it is another way of realizing purposes recited in the preamble—§ 1, 15 U.S.C.A. § 79a. Whether the Commission or the company begins is only a matter of procedure; the outcome will be precisely the same, for in either case the end sought is measured by subsection (b), an end whose realization the Act affirmatively prescribes. This once understood, it becomes to the highest degree unlikely that Congress should have set up a system of dual control over the fulfillment of this purpose; for it is scarcely necessary to expatiate upon the obvious defect of so organizing any official control; we have already declared ourselves on the matter in Phillips v. Securities and Exchange Commission.[3] Indeed, in First Iowa Hydro-Electric Cooperative v. Federal Power Commission,[4] the Supreme Court carried this consideration in disregard of the text of a statute to much greater lengths than is necessary here. We start therefore with the premise that only the most explicit and unescapable language will suffice to bring about a result which so impedes, and is likely altogether to thwart, an expressly declared object of the Act.

It is true that it not only provides in § 11 for "simplifying" the capitalization of holding companies; but in §§ 6 and 7 for protecting existing shareholders and the general buying public also. In § 6(a) it enacts that no company subject to it shall issue any new securities, or shall alter the rights of holders of its "outstanding" securities except as prescribed in § 7; and subsection (b) of § 7 provides that any company which wishes to do either of these things must get leave from the SEC. Subsections (c, d and e) prescribe what conditions the Commission may impose upon that leave; and subsection (g) provides that in states where there are commissions which have control over the issuance of new securities, or of altering the relations of "outstanding" securities, the SEC on being "informed" that the local laws have "not been complied with," shall withhold leave until it is "satisfied that such compliance has been effected." This section covers an entirely different situation from that within § 11. When a company files a "declaration" under § 7, it does so to promote its own interest; by hypothesis the law does not demand any change in the status quo. Not so of a situation which calls for intervention under § 11, for in such cases the public interest does call for change; and the Commission should move, unless the company anticipates it under subsection (e). Thus it follows that no purpose of the Act will be thwarted, if a "declaration" fails; § 7 demands no more than a scrutiny to guard against possible evil if leave be granted. It was not therefore unnatural to provide in subsection (g) that the "declaration" must "comply" with the local laws; and this is equally true whether that subsection should be read as making final the decision of the local commissions, or as leaving the last word with the SEC.

We are not to be misled by the fact that it is the company which takes the initiative in a proceeding under subsecton (e), or to suppose that this assimilates such a proceeding to a "declaration" under § 7. A proceeding under § 11(b) by the Commission itself would obviously be free from control by local state commissions; that subdivision unconditionally lays upon the Commission the duty to "simplify" the capitalization of holding companies and their subsidiaries, and otherwise to bring them into accord with the Act. Yet, if the PSC

---

[3] 2 Cir., 153 F.2d 27.

[4] 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143.

is right, although, when the SEC undertakes to discharge its "duty" upon its own initiative, it is unhampered, it must act in concert with any local commissons, if it is the company which brings before it precisely the same issues, to be decided by precisely the same considerations. As we have said, subsection (e) itself declares that the plan is only to enable the company "to comply with the provisions of subsection (b)." If this were the law, the SEC, whenever any local commission did not agree, should dismiss a proceeding under subsection (e) and institute one for itself under subsection (b). That is obviously an impossible interpretation to put on § 7(g).

■ Of those decisions of the SEC, which we cited at the outset, and which made use of subsections (c, d and e) of § 7 as a standard in passing upon plans submitted under § 11(e), we have only this to say. In deciding whether the new securities or the alterations, which such a plan proposes, are in accord with the purposes of the Act, it seems proper enough to take subsections (c, d and e) of § 7 as a standard; for Congress can scarcely have intended to distinguish between situations so completely alike in these respects. On the other hand if those subsections were to be taken as absolute limitations upon the powers of the Commission, when dealing with a plan submitted under § 11(e), as they are to be, when dealing with a "declaration" filed under § 7, it becomes difficult to answer the argument that subsection (g) must also be a limitation. Since, for the reasons we have given, it is incredible that subsection (g) should be thought to be a limitation upon dealing with a plan, we hold that subsections (c, d and e) are admonitory and not peremptory.

■■ The second objection raised by the PSC needs little discussion. That the value of investment securities may be measured by the prospective earning power of a company is now too well settled to admit of debate.[5] Whether there was any

evidence to support the conclusion that the old common shares had any value, based upon the future earning power of the Kings County Company, is an inquiry into which we are not disposed to enter. Any opinion is at best a guess, dependent, among other things, upon what rates the Company will be allowed to charge. There was certainly some basis for the valuation of the SEC when the order of the District Court was entered on July 16, 1947. How far later eevnts may have thrown doubt upon the plan, as then approved, we cannot consider; we pass upon the order as of the date when it was entered.

The constitutional question is too trivial to justify discussion.

Order affirmed.

[5] Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 525, 526, 61 S.Ct. 675, 85 L.Ed. 982; Ecker v. Western Pac. R. Co., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 872; Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 539–541, 63 S.Ct. 727, 87 L.Ed. 959; Reconstruction Finance Corporation v. Denver & R. G. & W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 90 L. Ed. 1400.