Charles T. PROUTY et al.

v.

CITIZENS UTILITIES COMPANY.

Civ. A. No. 2015.

United States District Court
D. Vermont.

April 9, 1957.

Arthur L. Graves, St. Johnsbury, Vt., Harold I. O'Brien, Rutland, Vt., for plaintiffs.

Clifton G. Parker, Morrisville, Vt., for defendant.

GIBSON, District Judge.

Plaintiffs seek specific performance by the defendant of a contract under the terms of which plaintiffs claim they are entitled to receive $300,000 from defendant, and in turn they are ready, willing, and able to deed certain real estate located along the Clyde River—in Orleans County, Vermont—to the defendant. Plaintiffs also seek an injunction restraining the Public Service Commission of Vermont from asserting jurisdiction of a petition for condemnation of this same real estate brought by the defendant before the Public Service Commission.

The defendant, in its answer, filed four affirmative defenses: First, that this Court lacks jurisdiction; second, that the Federal Power Commission is the only agency or tribunal that has jurisdiction; third, that the Vermont Public Service Commission has jurisdiction to hear defendant's condemnation petition now pending before it; and fourth, that the plaintiffs' complaint failed to state a cause of action.

The defendant also filed a motion to dismiss and a motion for judgment before trial, each based substantially on the affirmative defenses set forth in its answer.

This Court overruled the first, second, and fourth affirmative defenses, reserving decision on the third affirmative defense.

Trial was had in Rutland on November 13, 14, and 15, 1956. An advisory jury rendered a verdict declaring the Clyde River to have been a navigable stream at the time the defendant filed its petition for condemnation before the Vermont Public Service Commission.

### Findings of Fact.

1. The four individual plaintiffs, Charles Prouty, Genevieve Gage, John Prouty, and Elsinor Mallory, are citizens of Connecticut, Vermont, Vermont, and Florida, respectively. Plaintiff, the Third National Bank & Trust Co., is a Massachusetts corporation. Defendant is a utility company organized under the law of Delaware. The amount in controversy exceeds $3,000.

2. The plaintiffs are the present owners and successors in title to the lands and interests previously owned by Abbie D. Prouty, deceased, and are her only heirs.

3. Defendant is a utility company supplying electric power and energy to consumers in northern Vermont and Canada, as well as in three other states. It is the successor in ownership of the Newport Electric Light Co.

4. On July 29, 1930, the Newport Electric Light Co. and Abbie D. Prouty executed under seal a written contract providing, in substance, for a lease for a term of 25 years from the 1st of October, 1930, of land and interest in Newport, Vermont, described in the contract as follows:

"Being all and the same land and premises which were conveyed by Spaulding Brothers Corporation, a corporation, to Charles A. Prouty by warranty deed dated December 31, 1906, and recorded in Book 27, Pages 595 and 596 of the Land Records of the Town of Derby, Vermont, more particularly described as the 'Spaulding Pulp Mill Property' so-called, situated on Clyde River in the City of Newport, Orleans County and State of Vermont, a little above the plant of the Newport Electric Light Company, with all waterpower and water privileges thereunto belonging or appurtaining. Being the same land and premises conveyed to said Spaulding Brothers Company, a corporation, organized and existing under the laws of the State of Vermont by three several deeds:—

"(1) By a quit-claim deed from Edward F. Spaulding to said Corporation, dated August 26, 1901, and recorded in Book 25, page 80 of the Land Records of said town of Derby.

"(2) By a quit-claim deed from Waldo Spaulding to said corporation, dated August 26, 1901, recorded in Book 25, page 81 of the Land Records of the said Town of Derby.

"(3) And by Huntley N. Spaulding, as administrator of the estate of Jonas Spaulding, by an administrator's deed dated August 26, 1901, and recorded in Book 20, page 300 of the said Land Records, to which deeds and said records thereof, reference is hereby made for a more particular description.

"Meaning to include what is known as the Pulp Mill Property, water power, dam, water privileges, and all buildings, machinery and fixtures now on said property, and being the same real estate which was conveyed to the Newport Electric Light Company by Charles A. Prouty by an instrument dated June 29, 1907, and recorded in the Derby Land Records in Book 28, Pages 367 and 368; all of said property having been willed to Abbie D. Prouty by the late Charles A. Prouty, and having been decreed to said Abbie D. Prouty by the Probate Court for the District of Orleans, State of Vermont."

5. The above-described lands constitute an irregularly shaped piece of land that lies astride the Clyde River. The Clyde River runs in a northerly direction for about 700 feet through approximately the center of this piece of land.

Prior to 1930, the date of the lease, there had been a dam across the Clyde River, known as the Pulp Mill Dam. This dam lay about 225 feet from where the Clyde River enters this property on its southerly boundary. The dam had been abandoned, however, and there were only remnants of it there at the time of the lease.

Along the Clyde River, about 200 feet northerly or northeasterly of this abandoned dam, had been an old pulp mill and shed, and at one time water from the Pulp Mill Dam was conveyed down to the old pulp mill by a penstock. That penstock was still there and being used on the date of the lease. Indeed on the date of the lease there was a penstock running the entire length of the land in question along the east bank of the Clyde River, and in the vicinity of the old pulp mill it ran squarely in the bed of the Clyde River.

The predecessor in title of the defendant had constructed the penstock from where it entered the southerly edge of this property to the old penstock at the Pulp Mill Dam and there connected with the old penstock. It also erected the penstock which ran from the northerly terminus of what I will term the "Pulp Mill Dam penstock", in the vicinity of the old pulp mill, some 325 feet until it left the above-described premises at their northern border. This penstock continued on in a northerly direction to the power station of the defendant, located near the mouth of the Clyde River. Thus there was a penstock running across this entire property, most of it adjacent to the Clyde River on its east bank, totalling approximately 725 feet in distance in existence and in use at the date of the lease.

In 1931 or 1932, the defendant's predecessor in title constructed a second penstock from Clyde Pond to its power station near the mouth of the Clyde River. This second penstock lies easterly of the first penstock and crosses these lands for about 50 feet at the southeasterly corner of these premises and again for another approximately 175 feet running along the southeasterly border of these premises.

Both penstocks were being used by the defendant for the transportation of water when the lease hereinbefore referred to expired on the 1st day of October, 1955, and the defendant is continuing to use these penstocks at the present time. Both penstocks carry water diverted from the Clyde River.

6. This lease provided that the Newport Electric Light Co., its successors and assigns would pay Abbie Prouty, her heirs, administrators, executors and assigns, monthly rental at $625 and pay one-half of all taxes and assessments

levied against this property during the term of the lease.

7. The lease also contained the following provisions:

"The Lessee may acquire title to the property described herein at any time prior to October 1, 1935 by paying the Lessor therefor the sum of $150,000.00 and any rentals then due and owing in accordance with the terms hereof. If the Lessee elects to so purchase said property within said period of time and tenders the purchase price above described to the Lessor, the Lessor shall execute and deliver to the Lessee coincident with said tender of payment, a warranty deed conveying to the Lessee fee simple title to the property described herein, free and clear from all charges and or encumbrances against the same, and thereupon this agreement shall terminate, and both parties be released from further liability hereunder.

"Should the Lessee not elect to acquire title to the property described herein prior to October 1, 1935, then the Lessee agrees that within six months after October 1, 1955 it will purchase, and the Lessor agrees that within said six months period, she will sell and convey the premises herein described to the Lessee and by good and sufficient warranty deed convey said premises to said Lessee in fee simple, free and clear of all charges and encumbrances against the same at a price satisfactory to both parties hereto, or if they cannot agree upon such a price, then at a price to be determined in the following manner:

"(a) The Lessee shall within said six months period institute proceedings to acquire the property above described by condemnation, such proceedings to be instituted before the tribunal then having jurisdiction of such proceedings. The value fixed in said proceedings for the property herein described shall be the price which the Lessee shall pay, and the Lessor accepts for the deed above described to said property.

"(b) If no price is agreed upon by the parties within said six months period, or if the Lessee has not instituted condemnation proceedings within said period as provided in the preceding paragraph, then the price which the Lessor shall pay to the Lessee for said deed to said property shall be the sum of $300,000.00.

"The Lessee agrees that if it elects to proceed by condemnation proceedings as herein provided, it will prosecute said proceedings with all reasonable diligence to a termination thereof.

"For the period that may elapse between October 1, 1955 and the date when the Lessee acquires title to the property from the Lessor as herein provided, the Lessee shall pay the Lessor on the last day of each month during said period, as and for rental for the use of said property during said period, the sum of $625.00, and in addition shall pay one-half of any taxes or assessments levied against said property during said period."

8. The Lessee did not choose to acquire title to this real estate, water power, dam, water privileges, and all buildings, machinery and fixtures then on this property prior to October 1, 1935, as provided for in the contract. Nor have the plaintiffs and defendant, since October 1, 1955, reached an agreement as to a satisfactory purchase price.

9. The defendant has not paid, or offered to pay, to the plaintiffs the sum of $300,000. The plaintiffs have at all times been willing, ready and able to tender to the defendant a satisfactory deed of this land, water power, dam, water privileges, and all buildings, machinery and fixtures on the property as of the date of the lease.

10. On March 27, 1956, the defendant filed a petition with the Vermont Public Service Commission seeking to condemn the property and interests therein as described by the lease. This petition is still pending.

11. The jury found that the Clyde River was, in fact, a navigable stream within the meaning of the Federal Power Act. This verdict of the jury I approve.

12. Clyde River's source is in Island Pond in Brighton, Essex County, Vermont. It flows northwesterly through Charleston, Salem, Derby, and Newport into Lake Memphramagog. Generally speaking, it is a sluggish stream until it reaches to within a few miles of Lake Memphramagog. On its course it passes through Pensioners Pond and Salem Pond. It has a few short rapids. It is a principal tributary of Lake Memphramagog—itself a navigable body of water.

13. In the 18th Century it served as a highway for the Indians. From the St. Lawrence River the Indians would come up to the St. Francis and Magog Rivers in canoes, cross Lake Memphramagog, ascend the Clyde to Island Pond, and then make a short portage to the headwaters of the Nulhegan River—down the Nulhegan to the Connecticut River and down the Connecticut. Likewise, another Indian trail followed the same route from the St. Lawrence to the Connecticut; thence to the upper Ammonoosuc-up that river to some point in what is now Milan, New Hampshire; thence across to the Androscoggin River—and down it to the Atlantic Sea Coast and Penobscot Bay.

14. The Department of War sent a report to the House of Representatives of the Congress in April, 1826, which reported on the feasibility of a waterway from Lake Memphramagog to the Connecticut River by this route, and report-.ed, in substance, that it was a practicable project.

15. During the 19th and early 20th Centuries the Clyde River was used as a highway for commerce. Logs were floated from its upper reaches to saw mills in Derby. Logs were converted into lumber, transported to Newport and freighted by rail to Boston. Pulp was floated from the upper reaches of the Clyde River to Lake Memphramagog.

16. The defendant Citizens Utilities Company has not applied for or obtained a license from the Federal Power Commission, pursuant to the Federal Power Act, 16 U.S.C.A. § 791a et seq., for the purpose of constructing, operating and maintaining its said dam, water conduits, reservoirs, power houses, transmission lines and other works for the development, transmission and utilization of electrical power and energy, across, along, from, over, and in the Clyde River.

17. The defendant Citizens Utilities Company, notwithstanding the construction and operation of its said dam, water conduits, reservoirs, power houses, transmission lines and other works across, along, from, over, and in the Clyde River, has never filed a declaration of its intention with the Federal Power Commission to construct, improve, operate or maintain its said dam, water conduit, reservoir, power house, transmission lines and other works, or any of said structures, across, along, from, over, and in the Clyde River, pursuant to Section 23 of the Federal Power Act, 16 U.S.C.A. § 817.

18. The interest of the plaintiff, the Third National Bank and Trust Company, is nominal only, being that of a naked trustee for the benefit of Charles T. Prouty, and that it joins as a party plaintiff only, that all proper parties may be before the Court.

Conclusions of Law.

Here we have a contract action between citizens of different states, and the matter in controversy exceeds the value of $3,000, exclusive of interest and costs. Under § 1332(a) (1) of the U.S. Code, Title 28, this Court has original jurisdiction of this action. The defendant's first affirmative defense of lack of jurisdiction is entirely without substance.

Nor is there any merit in the fourth affirmative defense, i. e. that the complaint fails to state a cause of action. The complaint clearly alleges the existence of a written contract, a breach thereof, and a failure on the part of the defendant to comply with its terms. It

asks for specific performance of the contract by the defendant.

■■ Likewise, the defendant's second affirmative defense is unsound. It is to the effect that in any suit wherein violations of the Federal Power Act are involved, and compliance with the Act is sought, the proceedings must be brought exclusively by the Federal Power Commission. As a statement of the law, this proposition is valid. However, it is not applicable to this case. This action is a suit on a contract, for specific performance of a land purchase agreement; it is not a proceeding to compel compliance with the Federal Power Act. This suit does, as an incidental question, involve the interpretation of the Federal Power Act. This Court has jurisdiction to adjudicate such questions. There is nothing in the Federal Power Act, or any of the many Federal cases decided under it, which denies the U. S. Courts of jurisdiction to entertain suits which may incidentally involve interpretation of the Federal Power Act. Were such the case, and were we to hold as the defendant urges, the rendering of a final decision in a dispute such as this would be slowed down to a snail's pace. Prompt judicial determination of issues such as this would be rendered impossible. The whole cause of justice would be harmed. In United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, the United States brought a bill for an injunction against the Power Co., alleging that the New River was navigable. The District Court, 23 F.Supp. 83, heard the case and ruled the New River was non-navigable; the Court of Appeals agreed, 107 F.2d 769; but the Supreme Court held otherwise. No question was raised there that only the Federal Power Commission could determine the fact of navigability or non-navigability; nor could it have been successfully raised. The Federal Power Act grants no such exclusive right to the Federal Power Commission.

Thus we come to the third affirmative defense—and, as I see it, to the crux of this case. The defendant claims that the Vermont Public Service Commission does have jurisdiction to entertain the petition the defendant filed with that Commission on March 27, 1956. The prayer of that petition asks that "an order be made by the Commission entitling the petitioner to condemn said property and interests therein as above described." The "above described" refers to the description in the lease.

What is it that the defendant seeks to have the Vermont Public Service Commission condemn—it is what "is known as the Pulp Mill property, dam, water privileges, and all buildings, machinery and fixtures now on said property". It thus seeks to condemn the penstocks or water conduits being maintained and operated on this property. These water conduits are fixtures. It seeks to condemn water privileges—it must be the privilege of flowing waters diverted from a navigable stream through these conduits and ultimately to its power dam that it seeks to condemn. It seeks to do this without having sought or obtained a license to do so from the Federal Power Commission.

When Vermont joined the Union in 1791, it subscribed to the Constitution of the United States. The Commerce Clause of this Constitution grants to the United States full and exclusive power over those waters which are capable of use as interstate highways. At that time, Vermont, then, would have jurisdiction of the riparian banks and bed of a navigable stream, and the United States jurisdiction over the water flowing in the stream.

After several different attempts by the Congress, through Rivers and Harbors Acts, to effectively control these navigable streams, it finally passed, in 1920, the Federal Power Act. In 1930, the year the contract here sought to be enforced was signed, it amended the Federal Power Act and established the Federal Power Commission.

The Federal Power Act was designed, amongst other things, to integrate the Federal and State jurisdictions in licensing water power projects. In this Act

there is a separation of those subjects which remain under a state's jurisdiction from those subjects which the Commerce Clause of the United States Constitution delegates to the United States and over which Congress vests the Federal Power Commission with authority to act. To the extent of this separation, the Federal Power Act establishes a dual system of control. The United States and the State each have final authority within their own jurisdiction.

■ Where the Federal Government supersedes the State Government, there is no thought that the two agencies shall each have final authority. Thus the Federal Government, by the Federal Power Act, is given exclusive jurisdiction to issue licenses for construction of dams, conduits, etc. in any stream over which Congress has jurisdiction. Title 16, Section 797(e), U.S.C.A. To control conditions under which these licenses are granted, Section 803 was enacted. Particularly pertinent to this case (to forbid any person, state or municipality from constructing, operating, or maintaining any dam, water conduit, etc. across, along, or in any of the navigable waters of the United States), Section 817 was enacted. In these fields the jurisdiction of the United States is supreme. Congress, in 1935, by the amendment then adopted to the present Section 817, expressly required a Federal license for every water power project in the navigable waters of the United States.

It left to the States permission to construct such projects upon compliance with State laws, rather than with the Federal Power Act, provided the projects were not in navigable waters of the United States, did not affect the interests of interstate or foreign commerce, and did not affect the public lands or reservations of the United States.

Section 817 superseded state laws as to any state jurisdiction over dam construction or maintenance on navigable waters.

Clearly then, the Federal Power Act was an act seeking to integrate Federal and State jurisdiction in this field, and clearly the Federal Government has superseded the State Government in its jurisdiction of the Clyde River so far as power and navigation rights are concerned.

As I have commented, a main item of interest to the defendant in its petition to the Public Service Commission is to acquire the penstocks running over this property through which is carried the diverted water which helps manufacture the defendant's water power.

■ A dual final authority, with a duplicate system of State permits and Federal licenses required for each project, would make for chaos. It would be an impossible and completely unworkable situation. Congress did not intend to create such a situation. The Federal Power Act was meant to give the Federal Power Commission exclusive jurisdiction over all matters affecting a navigable stream.

It is clear to this Court that in this instance, the defendant, to comply with the terms of its contract, should have applied to the Federal Power Commission for a license or permission to acquire this property and interests therein.

It may well be, though we will never know, that when the parties executed the contract in 1930, the parties themselves were undecided as to what the tribunal would be which would have jurisdiction over the acquisition of these properties in 1955–1956. The Federal Power Act, passed in 1920, was amended in 1930, and the Federal Power Commission thereby created. It would have been a simple matter, had the defendant any doubt in its mind as to the tribunal having jurisdiction, to have filed a petition with the Federal Power Commission— as well as the Vermont Public Service Commission. Thus it could easily have abided by the terms of its contract.

This Court has spent considerable time in legal research of the problem in this case, but has found no cases which seem to be directly in point. However, my conclusion regarding the defendant's third affirmative defense seems to be in

accordance with the holding and intent of the U. S. Supreme Court, as found in the case of First Iowa Hydro-Electric Co-op. v. Federal Power Commission, 1946, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143.

Thus it follows that since defendant, on March 27, 1956, was maintaining these penstocks carrying water of a navigable stream across property it was seeking to condemn—including these penstocks—and it was not a licensee of the Federal Power Commission when it filed its petition with the Vermont Public Service Commission, the Public Service Commission was without jurisdiction to hear and determine the petition. Since the defendant, on or before April 1, 1956, had not instituted condemnation proceedings before any tribunal having jurisdiction of such proceedings for the purpose of acquiring the "Pulp Mill property, water power, dam, water privileges, and all buildings, machinery and fixtures" on this property as of October 1, 1930, the defendant is, under the contract, obligated to purchase the above-described property from the plaintiffs for $300,000.

Since the foregoing adjudication is dispositive of the case, the plaintiffs' request for an injunction restraining the Public Service Commission of Vermont from asserting jurisdiction of the petition for condemnation of this same real estate, is hereby denied.

### Judgment Order.

It is hereby ordered that the plaintiffs, Charles T. Prouty, et al., convey by warranty deed to the defendant, Citizens Utilities Company, all the realty, property, and proprietary interests described in the contract between the Newport Electric Light Co. and Abbie D. Prouty, dated July 29, 1930, pursuant to said contract. It is further ordered that upon tender of the above-described deed, the Citizens Utilities Company shall pay to the plaintiffs, Charles T. Prouty, et al., the sum of $300,000. Because the respective rights of the parties could not be determined before this date, no interest will be allowed.