FIRST IOWA HYDRO ELECTRIC CO-
OPERATIVE, F. A. E. Gillmor, Harry
J. Strong, and Harry Imel, Appellants,

v.

IOWA–ILLINOIS GAS and ELECTRIC
COMPANY, Iowa Power and Light
Company, Iowa Southern Utilities Com-
pany, Interstate Power Company, Un-
ion Electric Power Company, Kansas
City Power and Light Company, Iowa
Electric Light and Power Company,
Northwest Light and Power Company,
Wisconsin Power and Light Company,
Iowa Public Service Company and Iowa
Utilities Association, Appellees.

No. 15548.

United States Court of Appeals
Eighth Circuit.

May 24, 1957.

See also, 245 F.2d 630.

**614**

J. Roger Wollenberg, Washington, D. C. (Haley, Doty & Wollenberg, Washington, D. C., on the brief), for appellants.

Larned A. Waterman, Davenport, Iowa (Charles D. Waterman, W. B. Waterman, James J. Lamb, Charles D. Waterman, Jr., Donald H. Sitz, Davenport, Iowa, Howard A. Steele, W. Z. Proctor, Harris N. Coggeshall, Llewellen E. Slade, Des Moines, Iowa, Robert Valentine, Robert W. Greenleaf, Centerville, Iowa, R. W. Colflesh, Maxwell A. O'Brien, Des Moines, Iowa, Clement F. Springer, Robert W. Bergstrom, Chicago, Ill., E. Marshall Thomas, Francis J. O'Connor, Dubuque, Iowa, Robert H. Walker, W. Logan Huiskamp, Joseph A. Concannon, Keokuk, Iowa, V. Craven Shuttleworth, Tyrrell M. Ingersoll, Harry E. Wilmarth, Cedar Rapids, Iowa, Byron L. Sifford, Sioux City, Iowa, Byron Spencer, Joseph J. Kelly, Jr., Kansas City, Mo., Earl Smith, Mason City, Iowa, Frederic M. Miller, Joseph Brody, Val Schoenthal, and Sherwin J. Markman, Des Moines, Iowa, on the brief), for appellees.

Before WOODROUGH, VOGEL, and VAN OOSTERHOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

This action was brought on February 18, 1954, to recover treble damages and injunctive relief under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note and Clayton Act, 15 U.S.C.A. § 12 et seq., against the ten defendant utility corporations and

the unincorporated association which are here as appellees.

After the action had been pending nearly two years and on January 25, 1956, the District Court sustained motions made by the defendants to dismiss it for failure of plaintiffs to prosecute and for disobedience to Court orders in violation of the Federal Rules of Civil Procedure, 28 U.S.C.A. The Court dismissed the action at plaintiffs' costs [1] with directions that the dismissal should operate as an adjudication upon the merits. The grounds for dismissal were (1) that plaintiff Harry J. Strong as a party plaintiff and as an officer and manager of the corporate party plaintiff First Iowa Hydro Electric Cooperative and plaintiff F. A. E. Gillmor, president and director of said cooperative, each did willfully and without justification or excuse after having been ordered by the Court to testify by deposition, willfully and without justification or excuse refuse to do so; (2) and that the plaintiffs willfully and without justification or excuse failed and refused to comply with an order of the Court to make a deposit of $2500, to defray fees and disbursements of the Special Master.

This appeal is taken to reverse the judgment.

The defendants, except the unincorporated association and perhaps one or two others are, and long have been, engaged in distributing and selling electric power in an area that includes parts of Iowa and adjacent States. On September 8th, 1948, the Federal Power Commission granted a license to the plaintiff First Iowa Hydro Electric Cooperative to construct and operate a hydro-electric-project, No. 1853, in the Cedar River which flows through Iowa and to generate and sell its electric power in the same area where appellees operate. In State of Iowa v. Federal Power Commission, 8 Cir., 178 F.2d 421, this Court dismissed a petition to vacate the Commission's order granting the license to First Iowa Hydro Electric Cooperative. Our opinion contains a brief outline of the project and our conclusions concerning the powers of the Commission in the matter as declared by the Supreme Court in First Iowa Hydro Electric Cooperative v. Federal Power Commission, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143.

Although the probable cost of the project was estimated at many millions of dollars, the cooperative to which the license was granted consisted of the five persons who are joined with it as plaintiffs in this action. Each of the five has paid into the cooperative $2.00 for his share in it and the complaint alleged that "said individual plaintiffs constitute all of the members of the First Iowa Hydro Electric Cooperative and each own an equal one-fifth therein."

The complaint filed in this action charged that the defendants, beginning in 1938 when the cooperative was organized under the laws of Iowa (Chapter 390, § 8485-b 1 et seq. of the 1935 Code of Iowa, I.C.A. § 498.1 et seq.) and continuing thereafter, acted in conspiracy to violate and attempted to violate and violated the provisions against restraint of trade and monopoly contained in the Sherman Act and in the Clayton Act, first, to prevent the issuance of the license for the project to plaintiffs and then to prevent financing the project and construction of it by plaintiffs and thereby did prevent the plaintiffs "from obtaining the necessary funds to construct said project." The period of time covered by the complaint was from 1938 to 1956. Plaintiffs alleged they had been damaged by the defendants' conduct in the sum of $40,000,000 and prayed for recovery in the sum of $120,000,000. They also prayed that defendants be enjoined from continuing their wrongful acts and in strict accordance with Rule 38(b) of the Federal Rules of Civil Procedure, they demanded a trial by jury "of all the issues tendered by the above and foregoing complaint, except the issue whether or not the plaintiffs are entitled to the equitable injunctive relief prayed."

1. Except as to the Master's fees and disbursements, which were divided.

The allegations of wrong done by defendants against plaintiffs are set forth in the complaint, mostly in paragraph ten,[2] in general and sweeping terms and without identification of times, places, persons or utterances.

Likewise the allegations as to diligent efforts made by plaintiffs to obtain money to construct and carry out the project, No. 1853, and as to institutions which "would willingly have furnished the funds to pay the cost of said proposed project" are merely general.[3]

Shortly after the complaint was filed and before any of the defendants answered it, certain defendants began discovery proceedings by means of written interrogatories and notices of depositions of the plaintiffs, but the interrogatories propounded and the answers and the

2. Paragraph 10. "That since the organization of the plaintiff First Iowa Hydro Electric Cooperative in 1938, the defendants conspired to monopolize, monopolized, and attempted to monopolize the generation, transmission, distribution, and sale of electric light and power, in the area above described, and have unlawfully contracted, combined, and conspired to restrain trade and commerce among the several states in the distribution of electric light and power. These unlawful conspiracies to monopolize, and contracts and combinations, and conspiracies to restrain interstate trade and commerce in electric light and power have been and are being consummated by the following means and methods, among others:

"(a) Deliberate and continued attempts to prevent the issuance of a license to the plaintiff First Iowa Hydro Electric Cooperative and for the construction, operation and maintenance of the project originally known as the Cedar River Dam and later as Federal Power Commission Project No. 1853.

"(b) The agreement during the year 1948 reciting in substance their unalterable opposition to the proposed hydro electric project on the Cedar River in Muscatine County, Iowa; their agreement to pool their resources to oppose the construction of said project; and their further agreement that in the event said project should be built said defendants would not use any power from said generation facilities.

"(c) By threatening banks, bankers, financial institutions, their officers, brokers and or agents with boycott and loss of utility business on a national scale as well as the loss of future business from the members of the Iowa Utilities Association.

"(d) Carrying said agreement and conspiracy into effect by applying various persuasions, influences, threats, and intimidations to banks and banking and financial institutions solicited, requested, approached, and contracted in behalf of plaintiffs to assist in financing said project and thereby forcing and coercing said financial institutions to refuse to assist in the marketing of any securities to finance the cost of constructing said proposed project.

"(e) And otherwise hampering, interfering with, obstructing and impeding the financing of said project by divers and sundry means, methods and practices, the precise nature of which are unknown to these plaintiffs, but which proved nevertheless effective in thwarting and preventing the plaintiffs from obtaining the necessary funds to construct said project.

"(f) By various other unfair competitive practices designed to appropriate all of the electric light and power distribution in areas in Iowa, Illinois, Wisconsin, and Missouri hereinbefore referred to, all of which were designed to prevent plaintiff and other possible competitors from engaging in the generation and distribution of electric light and power in the area last above referred to."

3. The allegations are mostly in paragraphs and paragraphs number 12 and 15 of the complaint state:

Paragraph 12. "That plaintiffs have at all times since receiving their certificate to do business as an association made diligent effort to finance and construct said project, and they, together with various other individuals interested in the construction of said project and in the resulting generation, transmission, distribution and sale of electric light and power on reasonable terms in the territory adjacent thereto in the State of Iowa and adjoining states, began negotiations with various banks and financial institutions in New York City, Chicago, and elsewhere to arrange for the sale of bonds and other securities to pay for the cost of constructing said project."

Paragraph 15. "That but for the threats, intimidation, coercion and other activities of defendants hereinbefore described the financial institutions above referred to would have willingly furnished the funds to pay the cost of said proposed project."

notices gave rise to objections and motions and on March 30th, 1954, thirty days after the complaint had been filed, Judge Riley, on whose docket the case pended, conducted proceedings relative to preparing the case for trial at which all parties were represented by attorneys of record. Judge Riley observed that the charges in the complaint were very general; that under the old rules there would have been a plethora of motions for more specific statements and to strike and everything else; that little time should be wasted on those methods because of discovery proceedings designed to obviate them. Judge Riley stressed the seriousness of the charges in the complaint and their generality and declared that the defendants had the right to find out through depositions of the plaintiffs what the plaintiffs claimed the facts were on which they based their accusations and claims. The Judge accordingly made suggestions that all counsel sit down and try to figure out and agree among other things upon how the taking of the depositions of the individual plaintiffs should be handled in an orderly way and made suggestions how it could be done without undue duplication but in fairness to each of the eleven defendants.

He did not however require the defendants to file answers to the complaint before carrying on their discovery proceedings.

Apparently he thought that the defendants could obtain the information, to which they were entitled, from the individual plaintiffs by the production of documents and by depositions of plaintiffs. He directed the defendants to proceed to obtain the production of the documents by the plaintiffs and the taking of depositions of the individual plaintiffs in accordance with Rule 30.

It resulted that on July 9, 1954, the Court was called on to consider motions on behalf of both plaintiffs and defendants with respect to interrogatories which had been propounded and the responses prior to any pleading filed by defendants or the cause being at issue. After consideration of that situation, the Judge concluded that it was necessary to have the issues joined before proceeding further with the discovery proceedings and directed that defendants plead to the complaint within twenty days. At the same hearing he also entered an order to compel plaintiff Harry J. Strong to make and file a written oath to the effect, i. a., inter alia that he is secretary treasurer of the plaintiff cooperative, that the answers to interrogatories to which his signature was attached were made by him in that capacity as such officer for and on behalf of plaintiff [cooperative] and that his answers were true, etc., and that "failing this, plaintiff will be subject to sanctions under Rule 37."

A separate answer for each defendant was accordingly filed in due time, the answers being similar in respect to general and particular denials of all charges and each set up a number of specific defenses. But the generality of the pleadings left the defendants under the same necessity as before to find out through depositions of the plaintiffs what the plaintiffs claimed the facts were on which they based their charges and the court declared that its rulings on certain motions that had been filed were without prejudice to defendants' right to obtain by deposition the information they had sought by interrogatories.

Following the proceedings before Judge Riley on July 9, 1954, defendants were unable to compel the production of documents or the taking of depositions of the individual plaintiffs throughout the rest of the year 1954. Plaintiffs did not commence the production of the documents called for until January 18, 1955, and additional production was compelled by order of Judge Riley on March 24, 1955. The taking of the depositions of the individual plaintiffs which Judge Riley had declared to be the right of the defendants in his order of July 9, 1954, was delayed longer. Efforts to enter upon the taking of depositions by agreement failed and it was not until the 16th of May, 1955, about fifteen months after commencement of the action, that motions of certain defendants were sustain-

ed to the extent that the Court ordered that one of the defendants (Union Electric Power Company) should proceed to take the deposition of plaintiff Harry J. Strong on the sixth day of June, 1955, and named Commissioners to take the testimony and specified the place and hour. The Court directed the plaintiff Strong to present himself as the first witness and subject himself to examination as a witness until his deposition was concluded.

Afterwards on May 23, 1955, an order was entered by the Court which recited that it appeared from the record and from the statements of counsel that it would expedite the taking of depositions and be in the interest of justice to appoint a Special Master in connection therewith. Mr. Wayne G. Cook was appointed as Special Master to supervise the conduct of the taking of said depositions, to rule on objections and to rule on all applications for relief which may be made by any party. He was to have "such other powers as the Court may by order later prescribe" and the order appointing him provided that his compensation was to be paid by the defendants participating in the depositions.

The order for the appointment of Mr. Cook was made with the consent of all parties but before the taking of depositions began under it, plaintiffs moved to have the expense of plaintiffs' attorneys incidental to their attendance at the depositions assessed upon the defendants.

The motion was denied on June 4th, 1955.

The deposition of Strong was accordingly begun pursuant to the Court's order on June 6, 1955, before the appointed Master and was carried on with some intermissions for fifteen days and until June 24, 1955.

Strong's testimony showed that he had originally conceived the idea of the formation of the plaintiff cooperative. He had been its general manager since its formation, was its secretary-treasurer and handled its funds, kept the records and devoted his time to its affairs since

1938. The allegations and charges of the complaint were based largely on the information he furnished to the attorneys and all of the other individual plaintiffs who testified corroborated that Strong was at all times the guiding force of the cooperative. He could apparently have disclosed what basis he had for each of the charges made against defendants of wrongdoing in paragraph 10 of the complaint, but he reiterated day after day of his examination in response to inquiries as to whether he had disclosed all the facts on which he relied in respect to such allegations in substance, "I am sure that there are more * * * I can't recall them."

■ On the last few days of his examination, commencing on June 21, 1955, counsel began inquiring about the financial affairs of the cooperative. As the cooperative had no capital and proposed to obtain the millions necessary to pay for promotion expense, construction costs and commencement of operations from borrowing through the sale of bonds to be issued by it, the inquiry as to the handling of its financial affairs was relevant to the issue as to what caused the cooperative to fail, as to what transactions it had engaged in and as to damages.

Strong testified that the cooperative had never had a bank account in its own name and its funds were carried into his personal bank account; that he had "no way of knowing" how much of the $133,029.59, reflected in a certain report of the cooperative of August 9, 1952, to January 1, 1954, had gone through his personal account. He was asked how he accounted for a difference between the amount of money collected for the cooperative and the amount he showed had been spent and he replied, "I have no answer for it." He stated that he would not produce his personal records for defendants to hash over and stated: "It is none of your business."

On June 22, 1955, Strong's attorney objected to further questioning of Strong regarding the finances of the cooperative, but counsel for the defendant taking the

deposition, moved that the Master require Strong to produce his bank records because the personal and cooperative funds were shown to be commingled in those records. On examining the transcript and hearing the arguments, the Master ordered the production of the bank records. Thereupon the plaintiffs made charges against the Master, Mr. Cook, to the effect that he was disqualified to act as Master and they obtained a delay of the deposition until July 11, 1955, in consequence of the charges.

Strong was advised by the counsel examining him for the defendants that on resumption of his deposition there would be further questioning concerning the finances of the project.

The parties convened before the Master on July 11, but there was no examination of Strong until the morning of July 12th, when he submitted to questioning on matters other than finances. With exception of the questioning on that morning, Strong practically terminated the taking of his deposition on June 22, 1955, at the time when the Master heard the motion for production of his bank records and ruled that they should be produced. Strong prevented defendant Union Electric Company from completing its examination of him and none of the other defendants ever had an opportunity to examine him.

A number of continuances of his deposition applied for and granted at the instance of the plaintiffs or their attorneys contributed to the delay, but final action of the Court dismissing the action followed upon the absolute refusal of Strong to testify on October 20, 1955, his further refusal on November 18th, 1955 and again on December 20th, 1955, and upon the absolute refusal to testify by plaintiff Gillmor on January 10th, 1956.

As to Strong's refusal on October 10th, the record shows that at 11:00 o'clock on that day he came into the hearing room before the Master and all counsel pursuant to the order of the Court and notice duly given him and announced that he would not testify. The Master urged him "for his own good" to testify but he walked out of the room. Strong appeared again before the Master and all counsel on November 18th pursuant to the orders of the Court and of the Master and notice given him and when the question was raised whether he still refused to testify he departed from the hearing room. Again on December 20th, Strong appeared before the Master and attorneys pursuant to order and notice and asked to be excused from testifying. The Master declined to excuse him and admonished him that the consequence of his refusal to testify would be the entry of an order of dismissal. Strong said he would chance the dismissal and persisted in his refusal to testify.

The plaintiff F. A. E. Gillmor was the President of the Cooperative and the order of the Court for the taking of his deposition contemplated that it should follow after the completion of Strong's deposition. After that deposition was finally broken off by Strong's refusal to continue to testify and on December 22nd, 1955, the Master ordered Gillmor's deposition to commence on January 10th, 1956, and on that date Gillmor appeared before the Master and the attorneys of record for the parties. On being called on to take the oath he read a prepared statement and asked to be excused from testifying. The Master denied the request and Gillmor stated that he refused to testify and left the hearing room.

Thereafter the depositions of the three other individual plaintiffs were taken before the Master. They were generally to the effect that Strong was the one who devoted all of his time to the affairs of the cooperative. He had organized it and was the moving force and negotiated and took care of its business affairs, its records and its finances and "by and large was the man running the show." He made reports to the others and they had confidence in him and relied on him to carry on.

The Special Master duly reported to the Court the action of Strong and of Gillmor in refusing to testify. He also sustained motions made ·by de-

fendants to dismiss the action because of the refusal but the Court treated that action of the Master as merely a recommendation and the judgment of dismissal here appealed from is based on the findings and conclusions made by the Court.

As to the refusal of plaintiffs to make deposit for Master's fees, Judge Riley evidently thought the pre-trial proceedings which were manifestly necessary to define the issues and get the case ready for the jury trial which had been demanded would be speedily accomplished through the cooperation of the attorneys. He at first merely appointed persons to act as amanuenses in the taking of depositions of individual plaintiffs, but after the lapse of nearly fourteen months without a single deposition having been taken, he appointed Mr. Cook Special Master with powers to supervise the conduct of the taking of depositions of the five individual party plaintiffs "including the length thereof," as above stated, and both sides invoked the powers of the Master in the course of the taking of Strong's deposition before him. After Mr. Cook ruled that Strong's bank records should be produced the plaintiffs made complaint against him before Judge Riley and although the Court, after hearing, found there was no cause for Cook's removal as Master, his resignation was accepted on September 21, 1955, and Mr. Edward A. Doerr was appointed Special Master in his place.

The original order appointing Mr. Cook as Master provided that the Master should have "such other powers as the Court may by order prescribe" and in the order appointing his successor, Mr. Doerr, the powers were broadened to include "all powers authorized by Rule 53 of The Federal Rules of Civil Procedure" and "these powers he shall exercise until otherwise limited by order of this Court."

In his order appointing Mr. Doerr as Master, Judge Riley recited that extended discovery proceedings had been in progress and that they awaited resumption pursuant to order of Court and that there were controversies between plaintiffs and their counsel awaiting solution as to which Strong had requested disposition as soon as possible; that depositions were pending to preserve testimony and that the variety and number of the problems presented, the complicated nature of the issues involved, the best interests of all persons and parties affected and the interests of justice demand that "these proceedings" (evidently meaning the discovery proceedings) may be carried forward to their conclusion with the utmost dispatch.

The order appointing Mr. Doerr (the second Master) and prescribing his duties and powers conferred no powers in respect to the jury trial that had been duly demanded by the plaintiffs by endorsement on their complaint under Rule 38(b) and Judge Riley later declared that "the appointment of the Special Master does not and cannot deprive plaintiffs of their right to a jury trial, nor does it empower the Special Master ultimately to hear and determine the issues between the parties upon a trial of this cause." Mr. Doerr was never called on to perform any function in the case beyond discovery proceedings and in the matter of the attorney controversy, all preliminary to and in preparation for the jury trial on the merits.[5]

5. The order appointing Mr. Doerr contained the following recitals:

"There are eleven named defendants, ten of whom are alleged to be private corporations engaged in the business of producing, selling and distributing electrical power in Iowa, and the eleventh to be an unincorporated voluntary association, including ten named defendants among its members.

"The issues are complicated beyond those normally to be found in the usual action. There are extended discovery proceedings in progress since June 6, 1955, and now awaiting resumption on October 3, 1955, pursuant to order of Court. Controversies have arisen between plaintiffs and their counsel since August 29, 1955, which await solution, in respect of which plaintiff Harry J. Strong, has requested disposition as soon as possible; depositions are pending to preserve testimony and other factors urge the action herein ordered to be taken."

Coincident with its order appointing Mr. Doerr, on September 21, 1955, the Court ordered "the deposit forthwith into the registry of this court the sum of $2500.00 by plaintiffs and the sum of $2500.00 by defendants, to defray the fees and disbursements of the Special Master"[6] and on September 26, 1955, the plaintiffs moved the Court to "defer the requirements of the depositing of the sum of $2500.00 as ordered by this Court under its order dated September 21, 1955." The Court gave full consideration to the motion and denied it and thereupon ordered the plaintiffs to make the deposit of $2500.00 forthwith as a condition of going forward with their action.[7] Although the plaintiffs were fully able to comply with the order, they refused to make the deposit.

There was no question in the trial court and there is none here that when Strong refused to continue his deposition and when Gillmor refused to testify and when all the plaintiffs refused to make the deposit for costs ordered by the Court, each and all of them acted deliberately with full understanding that their refusals were in violation of the orders of the Court. They asserted a right to disobey the court as they did on the ground that they had lost confidence in their attorneys about the first of August, 1955. Their claim was that from that time on they were without the assistance of counsel of their own choosing.

They first called Judge Riley's attention to a quarrel between themselves and their local attorneys by a so-called pe-

---

"The present engagements of the court to which commitment had been made long prior to this date require continuous absence of the judge from this division for regular terms of the court, commencing on Sept. 26, 1955, in the Southern Division, Oct. 3, 1955, in the Western Division, Oct. 17, 1955, in the Ottumwa Division, Oct. 24, 1955, in the Central Division, and Nov. 28, 1955, in the Eastern Division of this District.

"The variety and number of the problems presented in this action, their complicated nature, the issues involved, the best interests of justice combine to demand that these proceedings may be carried forward to their conclusion with the utmost dispatch. The court recognizes that the expense consequent to the appointment of a master with general powers should make it the exception rather than the rule and has weighed the cost incident thereto against the benefits to be derived by all concerned, it is firmly persuaded that the circumstances described and involved and the peculiar urgency of the many and complex problems require departure from the rule of avoiding the appointment of special masters where possible."

"Accordingly, the court must find it to be advisable and necessary in the premises that a reference shall be made to a special master who shall have and exercise all powers permitted to masters under Rule 53 of the Federal Rules of Civil Procedure and such additional specified powers as later may be conferred upon and delegated to him in that capacity."

"* * * and that this entire cause be referred to him for such proceedings as may be necessary, to hear the evidence, to take testimony on any issue herein, to pass on disputed claims, to pass on applications of the parties and to make where necessary special findings of fact and conclusions of law thereon and to report the same to the court, and these powers he shall exercise until otherwise limited by order of this court."

6. "It is further ordered, that the fees and disbursements of the master shall be allowed by the court from time to time and that for the purpose of assuring the payment of his fees and disbursements as related to the services of the Special Master except as directed by Paragraph IV of the order of May 23, 1955, (defendants' discovery depositions were to be charged to defendants) there shall be forthwith paid into the registry of this court, $2500.00 by the plaintiffs and $2500.00 by the defendants, which sum shall be paid out to the Special Master upon the order of the court for the allowance of fees and disbursements, and that said sum shall be subject to increase from time to time as the necessities of the situation may require."

7. The order required the deposit for costs by plaintiffs because the plaintiffs were the moving parties in making charges against their attorneys of record and asking for speedy hearing of their evidence to support their charges. The costs of the master as to all discovery depositions taken by defendants remained chargeable to defendants only.

tition to intervene presented by four of the individual plaintiffs on September 2, 1955, in which they made charges against their attorneys and alleged that they had obtained an agreement from other attorneys of record and that the attorneys of record had agreed but had later declined and had moved to quash the entry of appearance. made by Bell, Farrar and Scott.

When the motion of the local attorneys of record to quash the appearance of Bell, Farrar and Scott was brought up for hearing, Bell, Farrar and Scott withdrew their appearance for plaintiffs and the Court accepted the withdrawal. The Court therefore found that the proceeding to quash the attorneys appearance had become moot leaving nothing before the Court for hearing and that a so-called petition of the individual plaintiffs in the case to intervene in the moot proceedings if regarded as filed, should be, and was stricken.

Accordingly all of the plaintiffs joined ten days later, on September 16, 1955, in filing a motion "by Harry J. Strong, Secretary-Treasurer," for leave to remove their attorneys of record as attorneys for plaintiff herein. The motion set forth numerous and serious charges made by the plaintiffs against their local attorneys of record and prayed leave to dismiss them.

The pendency of this motion was an important factor in Judge Riley's decision to appoint Mr. Doerr as Special Master some five days after the motion had been filed. In the order relieving Mr. Cook as Master, the Court stated in reference to this motion: "* * * and matters having recently arisen which make it desirable and in fact necessary, in the opinion of the Court, to immediately appoint a Master with broader powers." It was contemplated that the attorney dispute would be promptly presented to, passed upon and reported by Mr. Doerr. The defendants had nothing to do with the quarrel between plaintiffs and their attorneys of record, but the existence of that quarrel was a cause of delay and continued pendency in Court of the claim for $120,000 against the defendants, after the claim had already been held in Court for a year and a half. Judge Riley did not evince unwillingness to try the attorney controversy himself, but specified official obligations that would delay his doing so. Upon the appointment of Mr. Doerr as Master with full power to hear and report on the attorney controversy, Strong wrote to Doerr, as Special Master, explaining that the matter of removing plaintiff's attorneys of record had been assigned to him (Doerr) and requesting that an early hearing be had on the matter. Strong also requested in the letter that postponement of discovery proceedings be granted to enable new counsel to become informed and to prepare and proceed in the case.

Accordingly, Mr. Doerr as Master, within a few days after receiving the letter from Strong, entered an order setting the plaintiffs' motion to remove attorneys and any response to it for hearing before him on October 3rd, 1955, and directed that plaintiffs be represented on the hearings by counsel of their own choosing.

The attorneys of record for plaintiff filed a motion in resistance to the motion of plaintiffs to remove them as their attorneys and also sought affirmatively to compel plaintiffs to turn over to them some ten thousand dollars on account. Other parties who had advanced money to plaintiffs sought to intervene in the proceedings for removal of attorneys and to impress a trust upon the money advanced. These parties were denied relief and do not appeal.

Creditors also brought involuntary bankruptcy proceedings against the plaintiff cooperative which were heard before Judge Riley and a jury. In the course of the proceedings a receiver was appointed for the cooperative and Strong was ordered to turn the assets over to the receiver. The date of the turn over order was some months after the plaintiff had been ordered to make the deposit for costs and had made their refusal to comply.

On October 3, 1955, the day appointed for the hearing of the attorney controversy before the Master, the plaintiffs wilfully absented themselves from the hearing and on their failure to appear in person or by attorney, the Master adjudged them in default. The attorneys of record accordingly introduced their evidence and the Master found upon the evidence that there was no cause for discharging the attorneys; that they had faithfully and loyally performed their services for plaintiffs which were of great value, to wit: $200,000; that the attorneys recognized their continuing obligation to serve the plaintiffs and that there was no reason in plaintiffs' relationship with their attorneys for postponement of proceedings in the cause. The Master held that the plaintiffs had the right to discharge the attorneys but only on the condition of the payment of the fees and disbursements of the attorneys to the extent of the means possessed by plaintiffs and that it was left open to plaintiffs in spite of their default to show inability to comply with the conditions imposed. The conclusions of the Master were declared orally on October 3rd, and his opinion and order in writing were issued October 5th, 1955.

On the day of the hearing before the Master (October 3rd, 1955), Strong was in St. Paul, Minnesota, and there applied unsuccessfully to this Court in person for himself and the other plaintiffs for leave to file a petition for mandamus and injunction and for an order staying proceedings in this case.

A few days later, on October 10th, 1955, he filed an affidavit of bias and prejudice against Judge Riley in the District Court alleging that Judge Riley had a personal bias and prejudice against "our project, a hydro electric development on the Cedar River," and among other things that Judge Riley has issued orders in the case that were biased and prejudiced; that the Special Master (Doerr), appointed by Judge Riley, had in turn issued orders which carry out the bias and prejudice and that the biased

and prejudiced orders were merely a furtherance of defendants' strategy to completely break the plaintiffs so they could not pursue their cause of action. He also alleged that unless Judge Riley was removed as judge in the matter and all orders entered therein since September 2, 1955, were stricken, he and his associates would be denied a fair trial. He also stated in a "certificate" signed by him accompanying the affidavit of prejudice that it was filed because he felt it was the only means to hasten the trial of the cause.

On October 14, 1955, Judge Riley ordered a hearing on the affidavit on October 21st, 1955, and on that date having inquired into the timeliness and sufficiency of the affidavit of bias and prejudice he adjudged that it was not timely filed and was insufficient to meet the requirements of 28 U.S.C.A. § 144, since the bias was charged "against our project" and not against the plaintiffs or either of them and furthermore the affidavit was not accompanied, as required by the statute, by a certificate of counsel.

It is undisputed that Judge Riley's ruling was in accord with the statute and the proceedings in the case were properly continued "as though the affidavit had not been filed."

On January 20th, 1956, Judge Riley proceeded, after notice and with the consent of all parties, to hearing of the several motions made by defendants to dismiss the case for infractions of the Rules and failure to prosecute, the objections of plaintiffs to the reports of the Master Doerr, a motion by plaintiffs, filed on January 19, 1956, to vacate the order appointing Doerr as Master and to set aside all of his acts thereunder, and a motion by defendants to strike said motion to vacate, and on January 25, 1956, after a hearing, the Court filed its memorandum of decision upon all motions and objections then pending and its order for judgment. It set forth step by step all of the motions, hearings and rulings that had been had in the case and found no error

prejudicial to the plaintiffs and no controversy undetermined as to any facts in issue. The Court found the plaintiffs to be represented by their local attorneys of record and that the firm of attorneys appearing for them on this appeal, also appeared of counsel. It was further found:

"The complaint seeks recovery of $120,000,000 in treble damages and equitable relief under the anti-trust laws. The period of time covered by the complaint extends from 1938 to 1954. There are ten defendants, whose separate answers pose evidentiary and procedural problems of great magnitude. The issues in this action involve engineering, financing, economic and other technical problems of vast complexity. The discovery proceedings, still in their early stages, have resulted in volumes of testimony and documents. The record discloses many difficult problems pertaining to marketability of power, project design, economic and engineering feasibility, financing methods and expectations, costs of construction and power, additional and numerous expert witnesses, and other discovery proceedings requiring continued supervision to prevent oppression or hardship to any party. The documents which plaintiffs have voluntarily produced in response to defendants' interrogatories and which plaintiffs have produced under order of court and order of the Master are detailed and voluminous. For example, the transcripts of the Federal Power Commission hearings exceed 5,000 pages."

"I find that the issues are complicated and that the reference was not only proper but necessary in the interest of justice. This action, peculiarly and appropriately, requires the appointment of a Special Master."

The court said as to the refusals of Strong and Gillmor to testify:

"The deposition of Harry J. Strong was begun under an order of this Court, and its resumption was ordered both by this Court and by the Special Master. On September 28, 1955, the Special Master, upon the informal request of the witness, postponed the resumption date to October 10, 1955. On October 19, 1955, Harry J. Strong expressly refused to testify, although instructed twice by the Special Master to testify. The witness left the hearing room while one of the defendants was attempting to advise him that sanctions would be sought under Rule 37(d), should he persist in his refusal to testify. Despite such conduct, the Special Master gave the witness a final chance to testify and ordered his deposition to resume on December 6, 1955. In his order, which was entered on November 21, 1955, the Special Master found that the witness' refusal to testify was flagrant, wilful and without justification or excuse and had the necessary effect of disrupting orderly procedure and hampering defendants in making their defense. The witness was, and is, secretary, treasurer, director and general manager of plaintiff First Iowa Hydro Electric Cooperative. The order provided that, if the witness again refused to testify, the action would be dismissed as to plaintiff Harry J. Strong and First Iowa Hydro Electric Cooperative. The order was served on all of the named plaintiffs and on their attorneys of record. At the request of plaintiffs through their attorneys of record, the resumption date was postponed until December 20, 1955. On December 20, 1955, the witness was again present and again expressly refused to testify. He stated that he would take his chances on a dismissal of the action."

"I find that plaintiff, Harry J. Strong, was secretary, treasurer, director and managing agent of plain-

tiff First Iowa Hydro Electric Cooperative. I find that the refusal of the witness to testify was flagrant, wilful, and without justification or excuse and had the necessary effect of disrupting orderly procedure and was prejudicial to the defendants in making their defense. I find that, under the circumstances, there was no necessity for according this witness another chance to testify. As with Strong, the conduct of the Witness Gillmor was contumacious, his attitude defiant, his reasons for refusing to testify invalid. The (disrespect) which these parties exhibited toward judicial process is the proper subject of sanctions sought by defendants."

The final judgment of dismissal of the action provided that the dismissal should operate as an adjudication of the merits.

On this appeal taken to reverse the judgment of dismissal of the case with prejudice, the appellants are represented by the firm of Washington attorneys which appeared of record, as of counsel, on the complaint in the action.[8]

The points argued for reversal of the judgment are to the effect (1) that the reference to Special Master Doerr was unlawful and all orders issued in connection therewith and all acts under it were void; (2) that it was arbitrary and unlawful to dismiss the action for failure of plaintiffs to make the $2500 deposit and for failure of Strong and of Gillmor to testify; (3) and that plaintiffs were erroneously denied the right to be represented by counsel of their choice.

### 1. As to the reference to Master Doerr.

In their attack upon the District Court's appointment of Doerr as Master with "all powers authorized by Rule 53 of the Federal Rules of Civil Procedure" the appellants have relied mainly upon Howes Leather Company v. La Buy, 7 Cir., 226 F.2d 703, affirmed as La Buy v. Howes Leather Company, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290.

That action, like the one at bar, was for the recovery of treble damages and equitable relief by reason of defendants alleged violations and threats to violate the anti-trust laws. After long preparation, the case came on for trial and thereupon the District Court, instead of entering upon the trial, referred the case to a Master for trial over the objections of all parties. The Master ruled that the cause would proceed to trial before him and it was at that stage of the case that defendants petitioned the Court of Appeals for the 7th Circuit for a writ of mandamus to compel the District Judge to vacate the order of reference of the trial to the Master and direct the trial of the cause to proceed before the court. Judgment awarding the writ was granted by the Court of Appeals and the Supreme Court affirmed. The Supreme Court held that the Court of Appeals was justified in finding that the order of reference for trial of the case was an abuse of the power of the District Judge under Rule 53(b) amounting to little less than an abdication of the judicial function and depriving the parties of trial before the court on the basic issues involved in the litigation. When the reference was made there were no such complicated issues present as required by Rule 53 to justify the reference to a Master.

The case at bar presents an entirely different situation. Instead of this case being ready for trial or being turned over to a Master for trial on its merits, on basic issues between the parties, the case was "in an early stage" of preparation for trial when the Court made the reference to Mr. Doerr as Master.

At the time of the appointment on September 21st, 1955, more than a year and a half had elapsed since the action was brought and the pretrial proceedings for discovery were as found by the trial court, "still in their early stages."

---

8. Mr. Wollenberg has in the meantime succeeded Mr. Schellenberg as a member of the firm.

The complications of the issues and exceptional circumstances blocking the preparation for trial on the merits of the case were arising in those proceedings and as declared by Judge Riley, it was his purpose in making the appointment to provide for supervision of discovery proceedings and to "prevent oppression or hardship to any party."

Simply stated, the plaintiffs through their pleading were claiming in general terms that Project No. 1853 was a sound project and that they had been entitled to receive and would have promptly received their federal license therefor and would have obtained the money to promote, construct and operate the project, save that defendants' wrongs prevented. We think the Court did not distort or exaggerate the complications of the issues to be anticipated in the discovery proceedings carried on to find out the facts, or claimed facts, on which plaintiffs were basing such a cause of action or in the trial thereof. There is no contention that Judge Riley erred in declaring the right of defendants to attempt such discovery and we find no error in his conclusion that the issues involved in it were complicated and the case was exceptional in presenting occasion and necessity for the services of a Master preliminary to trial such as seldom arises in litigation. There was obvious possibility of oppression and hardship unless the discovery proceedings were continuously supervised and kept in order through the services of a Master. The Court took pains to prevent any financial burden on plaintiffs except in respect to the matter of the discharge of their attorneys wherein they were the moving parties requesting action and the issues between them and the defendants were not involved.

They had no right to hold their $120,000,000 claim against defendants in court unless they were able to prosecute their case. Through no fault of defendants, their quarrel with their attorneys was disabling them from prosecuting their suit. The appointment of the Master Doerr was made in part to expedite settlement on that matter and they acted reasonably and with good sense when they acquiesced in the appointment of Master Doerr and wrote to him for a speedy hearing of their quarrel with their attorneys.

█ It is true that in the order appointing Doerr after conferring upon him the powers authorized by Rule 53, the order reads "that this entire cause be referred to him for such proceedings as may be necessary, to hear evidence, to take testimony on any issue herein, to pass on disputed claims, to pass on applications of the parties and to make where necessary special findings of fact and conclusions of law thereon and to report the same to the Court, and these powers he shall exercise until otherwise limited by order of this Court."

Appellants have argued that by this wording the Court committed the trial of the case to the Master Doerr, but the order should not be so construed. The order was made "in the early stages" of discovery proceedings, the proceedings were expected to be extended and the difficulties to be met by the order were the exceptional complications in those proceedings.

Likewise the final clause directing the powers to be exercised "until otherwise limited by order of this Court," reflects that Judge Riley had only the Master's services preliminary to trial in mind as he declared in his order of January 9th, 1956.

Quite aside from any possible ambiguity in the order in respect to powers of the master that might have been asserted after the pretrial proceedings, the record shows that Doerr was never called on to exercise any such powers. All he had to do with what is here involved was the taking of discovery depositions and hearing the controversy over the discharge of attorneys.

The appointment of a Master to take depositions of plaintiff was agreed to by all parties and Strong gave his testimony before the Master without any

objection until the Master ordered the production of the bank records.

If there had ever been any ground for the plaintiffs to question the delegation by the Court of the taking of the discovery depositions, it had been fully and completely waived by the plaintiffs long before the plaintiffs committed the acts of disobedience that caused the dismissal.

■ We think the ruling of the Supreme Court against referring the final trial of the case to a Master in the La Buy case has no application to the order of the Court appointing Doerr as Master for the complicated and exceptional issues in the preliminary stages of this case.

The ruling of the Court appointing a Master is fully supported. Smith v. Brown, 5 Cir., 3 F.2d 926; Coyner v. United States, 7 Cir., 103 F.2d 629; Graffis v. Woodward, 7 Cir., 96 F.2d 329; Hart v. Williams, 91 U.S.App.D.C. 340, 202 F.2d 190; Tendler v. Jaffe, 92 U.S.App. D.C. 2, 203 F.2d 14, certiorari denied 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344. As this court recently stated: "Beyond the provisions of Rule 53, Federal Rules of Civil Procedure, 28 U.S.C.A., for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.' Ex parte Peterson, 253 U.S. 300, 312, 40 S.Ct. 543, 547, 64 L.Ed. 919; Westchester Fire Ins. Co. v. Bringle, 6 Cir., 86 F.2d 262, 263. While reference should be the exception and not the rule

in judicial administration, the Court may, in its discretion, make appointment of a Master to assist in any of the incidents of a proceeding before it, whether civil or criminal, so long as there is no infringement upon the right of trial by jury or any prejudice to other substantive right." Schwimmer v. United States, 8 Cir., 232 F.2d 855, 865.

Although the plaintiffs entered objections to the appointment of Master Doerr when they appeared before him on certain occasions, they did not present such an objection to Judge Riley until January 19th, 1956.[9] Long before they filed the motion shown in the footnote, the master had held numerous hearings and entered numerous orders and plaintiffs had frequently invoked his jurisdiction.

We emphasize again that the proceedings before the Special Master had not reached the trial stage. The court in its order of January 9, 1956, clearly indicated it was not its intention that the case should be heard upon its merits before the Special Master, stating [Appellees' Supplemental Record, p. 125]:

"It is further ordered, to permit all interested parties to be advised, that the order of September 21, 1955, appointing the Special Master does not and cannot deprive plaintiffs of their right of trial by jury if their request therefor has been seasonably made, nor does it empower the Special Master ultimately to hear and determine the issues between the parties upon the trial of this cause, but does empower the Spe-

---

**9.** Their motion filed on January 19, 1956, reads:

"Come now the plaintiffs and their attorneys of record, in behalf of plaintiffs and in behalf of their attorneys of record, and move the court to make an order vacating and setting aside the order made by this Court on Sept. 21, 1955, appointing Edward A. Doerr Special Master in this cause, for each and all of the reasons set forth in the petitions for review of the orders of the Special Master which were filed in this cause with respect to the orders made by the Special Master

on Dec. 22, 1955, and Jan. 16, 1956, and the grounds stated in the objections and exceptions to the report of the Special Master which was filed January 4, 1956, and to the supplemental report which was filed Jan. 17, 1956, and the objections urged and interposed orally in the record by these parties prior to each hearing and proceeding before said Special Master and said reasons, grounds and objections are hereby incorporated herein by reference thereto and made a part as fully as if set forth at length, herein, in support of this motion."

cial Master to proceed in respect of legal questions to be ruled upon, subject to the court's approval, and to have such other powers, not including trial of the issues, as are described in Rule 53(c) of the Federal Rules of Civil Procedure, or otherwise stated in the order of appointment of September 21, 1955, and not inconsistent with this order."

The court was legally empowered to appoint a master to carry out the functions actually performed by the master in this case.

■ Under the circumstances, Judge Riley's ruling that plaintiffs waived any error that may have been committed in the appointment of Master Doerr was not erroneous. Failure to make timely objection to the appointment of a Master either at the time of the order or promptly thereafter constitutes a waiver of error and objections made only to the Master are unavailing.

■ Appellants' contention that the proceedings and orders of the Master were nullities is without merit. In any event there is no basis for the contention of appellants that the reference to the Master was entirely void and that his proceedings and orders were nullities. The power to refer is conferred in positive and unequivocal terms by Rule 53 and mere error in the exercise can only be corrected in direct proceedings. Hart v. Williams, 91 U.S.App.D.C. 340, 202 F. 2d 190; Coyner v. United States, 7 Cir., 103 F.2d 629; Smith v. Brown, 5 Cir., 3 F.2d 926; Flanders v. Coleman, D.C., 249 F. 757, reversed on other grounds, 250 U.S. 223, 39 S.Ct. 472, 63 L.Ed. 948.

2. As to the Dismissal.

■ It is contended for appellants that they "were not contumacious" and that "their motives were not contumacious" in refusing to testify and in refusing to make the deposit for costs ordered by the court and that "dismissal was a harsh and unjustified penalty to impose upon confused laymen," but there is no claim that the individual plaintiffs did not fully understand that they were disobeying the order of the court when they refused to testify and when they refused to make the deposit or that their disobedience was other than wilful and deliberate.

■ Under Rule 37(d) and Rule 41 (b) of the Federal Rules of Civil Procedure as well as in the exercise of its inherent power the District Court is authorized to dismiss the action of any individual plaintiff who wilfully disobeys a proper order of the court to compel the giving of security or the giving of testimony on deposition and to dismiss the action of a corporation plaintiff whose managing agent so offends. We think the contention that dismissal was unduly harsh or unjustified is without merit. It was the right of the plaintiffs to prosecute the action for the recovery of $120,000,000 against the defendants regardless of the burden it imposed on defendants, but only in the orderly course and in obedience to proper court orders. The Court would not have been justified in granting leniency or indulgence to the plaintiffs at the expense of the defendants. We find there was no abuse of discretion in the application by the Court of the sanction that was authorized by the Federal Rules of Civil Procedure, and by the inherent powers of the Court.

3. As to denial of right of Counsel.

It was strenuously urged that the plaintiffs were erroneously denied the right to be represented by counsel of their choice and many cases are cited to the effect that the right is held to be a fundamental one and the denial of it prevents according a fair trial.

The record shows that on the occasions when Strong and Gillmor refused to testify and when all plaintiffs refused to deposit the ordered security for costs, they asserted that they were without counsel of their choice and they based their disobedience to the Court's order on that claim. The trial court found that it was not in accord with the facts because there was no claim or showing that the firm of attorneys appearing on

the complaint as of counsel (who now appear for them on this appeal) were not available to them and because they had requested and had been given opportunity to show any reason they had for distrusting and discharging their attorneys of record and they wilfully absented themselves from the hearing and that matter set by the Master and refused to afford proof of any reason for their alleged distrust. Upon their default it was found from the evidence adduced that they had no such reason for distrust and their attorneys were available to them. They took no steps to have the default entered against them set aside or the order entered by the Master vacated by the Court and the record does not indicate that they had any ground for such relief. It was necessary that the questions of their representation by counsel be settled in order for them to proceed with the case against defendants and it was so settled. It was their own conduct which prevented a change of attorney relationship and the fact that they were dissatisfied did not entitle them to disobey the court's orders or to block disposition of the case.

 It is true the charges they made against their local attorneys were serious and if they had proven them when they were given the opportunity to do so, no doubt the attorneys would have been unconditionally discharged. But their mere accusations without proof conferred no right and supplied no excuse to plaintiffs for their disobedience of the Court orders.

 The plaintiffs were not entitled as of course and without cause to an order unconditionally substituting other counsel for the attorneys of record employed by them and it was within the discretion of the Court or Master to require that the attorneys be paid or secured as a condition to granting the request for substitution of new counsel.[10] Doggett v. Deauville Corp., 5 Cir., 148 F.2d 881 and cases cited therein. Woodbury v. Andrews Jergens Co., 2 Cir., 69 F.2d 49.

 The record shows that after plaintiffs had refused to offer any proof of cause of their claimed distrust of their local attorneys of record and had defaulted at the hearing of that matter, Mr. Strong and in some instances the other individual plaintiffs with him, filed motions and other papers in the case assuming to represent the corporation or themselves or both in invoking Court action. But such filing was in conflict with the provisions of Rules 11 and 7 (b) (2) of the Federal Rules of Civil Procedure and would, if permitted to stand, have had the effect of nullifying the orders that had been made by the Court in respect to the attorney controversy and depositing security. Although appellants complain of the action of the Court in striking the filings which were made contrary to the provisions of the Rules, we do not find the ruling was erroneous.

Our conclusion on consideration of the whole record and all contentions is that appellants were accorded fair and just treatment by the trial court and that their own refusal to proceed in accord with Rules of Procedure and wilful and deliberate disobedience of the orders of the Court necessitated and justified the dismissal of the case with prejudice.

Affirmed.

---

10. On the evidence before him it appeared to the Master that the services the attorneys had performed were of the value of $200,000.00 but he held it open to plaintiffs notwithstanding their default to be heard on the question of the terms of the condition upon the discharge of the attorneys.